707 A.2d 1331

## MONTGOMERY COUNTY DEPARTMENT OF SOCIAL SERVICES

v.

## L.D.

## T.E.P.

v.

## ANNE ARUNDEL COUNTY DEPARTMENT OF SOCIAL SERVICES.

## D.N.

v.

## FREDERICK COUNTY DEPARTMENT OF SOCIAL SERVICES.

**No. 75, Sept. Term, 1997.**

Court of Appeals of Maryland.

April 9, 1998.

· Sandra Barnes, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioners.

Richard S. O'Connor, Rockville, Christyne L. Neff (Kahn, Smith & Collins, P.A.), Baltimore, Joseph F. Devlin, Brendan J. Clary, Glen Burnie, on brief, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

The instant case arises from the consolidation of three appeals involving individuals accused of child abuse or neglect: *Montgomery County Department of Social Services v. L.D., T.E.P. v. Anne Arundel County Department of Social Services,* and *D.N. v. Frederick County Department of Social Services.*[1] In each of these cases, the individuals have been the object of child abuse or child neglect investigations by the respective local departments, and in each of the cases, the investigation resulted in local department findings of either "indicated" or "unsubstantiated." These appeals follow from each individual's petition in the circuit court for judicial review of the local department's actions with respect to the inclusion of the petitioners' names on databases that they contend are "central registries."

Before our discussion of the law and resolution of the issues of this appeal, we shall describe briefly the procedural history and questions presented in each case.

## I. Facts and Procedural History

### *Montgomery County Department of Social Services v. L.D.*

#### 1. Procedural History

Pursuant to sections 5–706.1 and 5–706.2 of the Maryland Code (1984, 1991 Repl.Vol., 1997 Supp.) of the Family Law Article,[2] the Office of Administrative Hearings (OAH) affirmed

---

1. In this opinion, we shall sometimes refer to the Montgomery County Department of Social Services as MCDSS, to the Anne Arundel County Department of Social Services as AACDSS, and to the Frederick County Department of Social Services as FCDSS, or each as "departments" or "local departments," interchangeably.

2. All statutory references shall be to the Family Law Article unless otherwise indicated.

MCDSS's [3] finding that L.D., a day care provider, was responsible for "indicated" neglect. L.D. filed a petition for judicial review in the Circuit Court for Montgomery County. L.D.'s appeal was stayed pending this Court's decision in *C.S. v. Prince George's County Department of Social Services*, 343 Md. 14, 33, 680 A.2d 470, 480 (1996), where we held that section "5–715 provides a right to a contested case hearing" before entering the name of an alleged child abuser or neglector in a central registry.

In reaction to our opinion in *C.S.,* the Department of Human Resources (Department or DHR), deactivated the Child Abuse and Neglect Central Registry (Central Registry).[4] MCDSS then notified L.D. that L.D.'s name would not be entered into the Central Registry because it had been deactivated. L.D.'s name, however, would be listed along with the local department's findings on a computerized central database known as the Automated Master File (AMF). MCDSS then moved to dismiss L.D.'s petition for judicial review for lack of subject matter jurisdiction on grounds that because L.D.'s name would no longer be entered on the Central Registry, *C.S.*'s requirement that a local department hold a contested case hearing was no longer applicable and because sections 5–706.1 and 5–706.2, the statutory provisions authorizing a limited hearing at which an accused individual can contest local department findings, do not authorize judicial review.

The Circuit Court for Montgomery County denied MCDSS's motion. The court found that MCDSS's entry of the names of

---

3. The Montgomery County Department of Social Services is now known as the Montgomery County Department of Health and Human Services. For the purpose of consistency within this opinion, we shall refer to the agency by its former title or, alternatively, MCDSS.

4. In the past, the Social Services Administration (SSA) within DHR maintained the now-defunct central registry called the "Child Abuse and Neglect Central Registry." For purposes of this opinion, we shall refer to this registry as "the Central Registry," and shall refer to central registries in general, including the Central Registry and any other central registry maintained by the SSA or local departments as "central registries."

individuals found by MCDSS to have committed child abuse or neglect into the AMF or the Client Information System (CIS),[5] which could be accessed by agencies and other entities throughout the state, constituted an entry into "a central registry." The court further found that, under *C.S.*, the inclusion of L.D.'s name on this registry invoked a right to a "contested case" hearing under the Administrative Procedure Act, Maryland Code (1984, 1995 Repl.Vol., 1997 Supp.), sections 10–201 through 10–227, State Government Article (SG). MCDSS noted a timely appeal to the Court of Special Appeals, and this Court granted the local department's Petition for Writ of Certiorari before that court heard arguments in the matter.

### 2. Questions Presented

MCDSS presents the following questions for our review:

1. May local departments maintain files relating to child abuse and neglect investigations and reference those files in a computerized data base without triggering a right to a contested case hearing and judicial review?

2. Absent a showing that a Chapter 318 hearing affects any right, entitlement, benefit, or license due under law, does the judiciary have an inherent right to review a local department's investigation of a report of suspected child abuse or neglect?

Because of our ultimate resolution in this case, it is unnecessary for us to address directly MCDSS's second question.

### *D.N. v. Frederick County Department of Social Services*

### 1. Procedural History

D.N. is a tenured public school teacher originally found by FCDSS as responsible for the indicated abuse of a student. The accusation arose out of an incident in which D.N., an

---

**5.** The Automated Master File and the Client Information System are computerized statewide databases, which we shall describe further in our discussion, *infra*.

industrial arts teacher for the hearing impaired, burned a student in a shop class by a hot tool D.N. was bringing to the student for the student's use in the class. According to D.N., the contact was accidental. Complicating the issue was what D.N. perceived as a misunderstanding regarding a distinction in American Sign Language (ASL) vocabulary and the student's misinterpretation of an ASL sign as demonstrating D.N.'s intent to burn the student. A FCDSS caseworker determined that the contact was intentional and made a finding of "indicated" child abuse.

FCDSS notified D.N. of its finding. D.N. filed an appeal with the OAH, requesting a contested case hearing. As a result of the first stage of that appeal, FCDSS notified D.N. that it had conducted a review of its records in the case and that its finding would remain as "indicated." After an *in camera* review by the OAH, the OAH likewise notified D.N. that FCDSS's finding would not be modified. Finally, after D.N. submitted supporting memoranda and made a fifteen minute oral argument before an Administrative Law Judge (ALJ), the ALJ determined that there were serious flaws in FCDSS's investigative process, but because she did not have the authority to order such a contested case hearing, only reduced MCDSS's finding to "unsubstantiated."

D.N. filed a petition for judicial review in the Circuit Court for Frederick County. A hearing on that petition was stayed pending our decision in *C.S.*, 343 Md. 14, 680 A.2d 470. After we filed our opinion in that case, FCDSS notified D.N. that D.N.'s name would not be entered on the Child Abuse and Neglect Central Registry. FCDSS retained D.N.'s name and investigation records, however, on the AMF/CIS registries. FCDSS then filed a motion to dismiss D.N.'s petition for judicial review. In an opposing motion for summary judgment, D.N. requested that the trial judge remand the case to the OAH for a "contested case" hearing pursuant to the APA. The trial judge granted FCDSS's motion to dismiss, but in his oral ruling from the bench, acknowledged the need for "further direction from the [a]ppellate [c]ourt.... [W]hat you

really need is for the Court of Special Appeals, or hopefully, Court of Appeals, to take this up and clarify what *C.S.* means."

D.N. timely appealed the circuit court's denial of its petition for judicial review to the Court of Special Appeals. As with the other two cases at hand, we granted Writ of Certiorari and consolidated all three cases before that court heard arguments in the matter.

## 2. Questions Presented

D.N. presents the following questions for our review:

 May the local departments of social services elude the Court's holding in *C.S. v. Prince George's County Department of Social Services*, 343 Md. 14, 680 A.2d 470 (1996), that, "[Family Law] Section 5–715 provides an alleged abuser with a separate and independent right to an administrative hearing before his or her name may be entered into a central registry[,]" and that "the hearing under [section] 5–715 qualifies as a 'contested case' hearing under the APA[,]" by disbanding one child abuse registry while continuing to register the child abuse finding in other State-wide central databases?

 Does a public school teacher have a right, under State law and the State and federal constitutions, to a contested case hearing prior to a local department of social services register[ing] a child abuse finding against that teacher when the public school employer has free access to that child abuse finding and when there is a resultant threat to employment and *de facto* loss of employment opportunity for that public school teacher?

 Is there a right to petition for judicial review from a . . . quasi-judicial decision of the Office of Administrative Hearings regarding the finding that a person is a child abuser, where that decision is a final one as delegated to OAH by a State agency, and where interpretation of State law and rights guaranteed under State and federal constitutions are at issue?

Because of our resolution of D.N.'s first question, we shall not address the third question or resolve directly the second question.

### T.E.P. v. Anne Arundel County Department of Social Services

#### 1. Procedural History

T.E.P., a private school teacher, was classified by AACDSS as an "indicated" abuser after an in-school paddling of a student by T.E.P. Although criminal charges were filed against T.E.P., a District Court judge dismissed those charges at a preliminary hearing.

T.E.P. appealed AACDSS's findings pursuant to sections 5–706.1 and 5–706.2. The ALJ upheld the findings, and T.E.P. sought judicial review of that decision in the Circuit Court for Anne Arundel County. AACDS advised T.E.P., after this Court's decision in *C.S.*, that T.E.P.'s name would not be entered into the Child Abuse and Neglect Central Registry because that registry had been deactivated. AACDSS then moved to dismiss T.E.P.'s petition for judicial review, arguing that T.E.P. "is not entitled under *C.S.* to a contested case hearing before OAH or to judicial review of decision rendered in the Chapter 318 hearing." AACDS informed T.E.P., however, that T.E.P.'s name would be entered in its "current registry."

The circuit court granted AACDSS's motion. T.E.P. noted a timely appeal to the Court of Special Appeals. This Court granted the local department's Petition for Writ of Certiorari and consolidated review with the *L.D.* and *D.N.* cases before the Court of Special Appeals heard argument.

#### 2. Questions Presented

T.E.P. presents the following questions for our review:

1. Are the statewide computer databases classifying individuals as child abusers, "central registries" under Family Law Article Sections 5–714 and 5–715 requiring a contested

case hearing prior to placement of an individual in the database?

2. Does inevitable governmental dissemination of an "indicated" finding of child abuse to a prospective employer impinge upon an individual's liberty right to follow a chosen profession thereby mandating contested case procedures, judicial review or other due process under the Maryland Declaration of Rights and the United States Constitution?

3. Does the inherent right of judicial review of arbitrary and capricious administrative decisions involving personal rights attach to a "Chapter 318 hearing" in which an "indicated" finding of abuse is sustained?

Because of our resolution of T.E.P.'s first question we will not address directly questions two or three.

## The Consolidated Question

We shall consolidate the first questions of each petitioner into a single question, the answer to which resolves all of the cases:

Does the inclusion of the names of individuals in databases accessible on a statewide basis to all local departments and other entities constitute "a central registry" as contemplated by sections 5–714 and 5–715, therefore requiring that "contested case" hearings under the APA be afforded prior to the inclusion of names in the databases?

## II. Discussion

### Statutory Framework [6]

Maryland's Child Abuse and Neglect statute is set forth in sections 5–701 to 5–715 of the Maryland Code (1984, 1991 Repl.Vol., 1997 Supp.), Family Law Article. Pursuant to section 5–706, a local department, after receiving a report and

---

6. For a more detailed explanation of all the procedures for reporting and investigating suspected child maltreatment, see former Chief Judge Murphy's discussion in *C.S. v. Prince George's County Department of Social Services,* 343 Md. 14, 17–22, 680 A.2d 470, 472–74 (1996).

conducting an investigation of suspected child abuse or neglect, makes a finding as to whether neglect or abuse was "indicated" or "unsubstantiated" or "ruled out." A finding of indicated means that the local department found "credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur." § 5–701(k). A finding of unsubstantiated means the there was insufficient "evidence to support a finding of indicated or ruled out." § 5–701(v). A finding of ruled out is "a finding that abuse, neglect, or sexual abuse did not occur." § 5–701(t). If the local department makes a finding of indicated or unsubstantiated abuse or neglect, it must notify, within thirty days after the investigation is complete, the person who allegedly committed the abuse or neglect of that finding and his right to appeal the finding in an administrative hearing. § 5–706.1(a). These hearings to contest local department findings of indicated or unsubstantiated neglect or abuse commonly are called "Chapter 318 hearings," referring to the legislative act creating them. *See generally* 1993 Md. Laws, Chap. 318.[7]

### 1. Chapter 318 Hearings

Upon notification by a local department that an accused has been found responsible for the indicated or unsubstantiated abuse or neglect of a child, he or she can request an administrative hearing by responding to the local department's notice in writing within sixty days. § 5–706.1(b). Within ten days of receipt of a request for a hearing, the department must "review all records and reports concerning the alleged abuse or neglect" and then "determine whether the finding shall be amended, modified, or expunged." § 5–706.1(d). Also within ten days of receiving the request for an administrative hearing, the local department is required to forward to OAH the request for the administrative hearing. § 5–706.1(c). *See also* § 5–706.2(b) (requiring the Department to forward to OAH all reports and records regarding the case upon the

---

7. Sections 5–714 and 5–715, which provide for the hearings that we held were to be contested case hearings in *C.S.*, predate the 1993 enactment of Chapter 318.

accused's request for a hearing). If the local department has not changed its findings to "ruled out," the records must be transferred to the OAH and the accused can then request an *in camera* review of the full report or record by an ALJ "to determine the accuracy and sufficiency of the report or record." § 5–706.2(a).

After the ALJ determines that the information "in the report or record is sufficient and accurate for purposes of determining an issue in a proceeding," the information in that record or report may be forwarded to the accused. § 5–706.2(c). If the accused contests the findings, he or she may submit additional written information to the ALJ. § 5–706.2(d)(1). The ALJ then determines the correctness of the findings and, if incorrect, must "order the Department to amend, modify, or expunge the finding, as appropriate." *Id.* It is important to note that the informal nature of Chapter 318 hearings allows for no presentation of evidence or testimony of witnesses by the accused.

## 2. Maintenance of Records

Information relating to child abuse or neglect is stored by the local departments and the Social Services Administration (SSA), which is a branch of the DHR. Local departments are required, in cases of child abuse or neglect, to "maintain records relating to the report and investigation which identify individuals involved in the investigation or assessment by name and address, including the identification of any needed services and an assessment of risk, in accordance with Regulation .18 of this chapter." COMAR 07.02.07.14B(1). In addition, records relating to any case-related investigations, assessments, or services offered must be maintained by the local department. COMAR 07.02.07.14B(1) and (2). The Child Abuse and Neglect statute defines a record as

the original or any copy of any documentary material, in any form, including a report of suspected child abuse or neglect, that is made by, received by, or received from the State, a county, or a municipal corporation in the State, or any

subdivision or agency concerning a case of alleged child abuse or neglect.

§ 5–701(r). *See also* COMAR 07.02.07.02(26); COMAR 07.02.26.02(11). A report is defined as "an allegation of abuse or neglect, made or received under" the Child Abuse and Neglect statute. § 5.701(s). *See also* COMAR 07.02.07.02(28); COMAR 07.02.26.02(12). If abuse or neglect is ruled out and no further reports of abuse or neglect received, the report and investigative findings are expunged from the local department's records within 120 days of the conclusion of the investigation. § 5–707(b)(2); COMAR 07.02.07.18B. If the department concludes that the abuse or neglect is unsubstantiated, reports and findings are expunged within five years of the conclusion of the investigation if no further reports of abuse or neglect are received during that time. § 5–707(b)(1); COMAR 07.02.07.18(A). Findings of indicated abuse can remain on record indefinitely.[8]

### 3. Central Registry

The Child Abuse and Neglect Central Registry originally was created by the Legislature in 1966, and its existence was mandatory. *See* 1966 Md. Laws, Chap. 221. In 1987, the Legislature amended the statute and provided that the maintenance of the Central Registry was discretionary. 1987 Md. Laws, Chap. 635. Thus, as part of its records and pursuant to the present provisions of § 5–714, the SSA "and each local department may maintain a central registry of cases reported under this subtitle," containing the information gathered by the local departments from around the state. § 5–714(a) and (b).

The statute does not define "central registry." DHR regulations, however, define it as

---

**8.** The Department, however, must remove a suspected abuser's or neglector's name from a central registry if no other entry has been made for that individual for seven years subsequent to the entry of their name in a registry, regardless of the department's ultimate findings. Section 5–715(e).

a centralized listing of individuals identified in the local department of social services written findings of an investigation of suspected abuse or neglect, pursuant to Family Law Article, § 5–701 et seq., Annotated Code of Maryland, as responsible or allegedly responsible for causing the injury, harm, or substantial risk of harm to a child.

COMAR 07.02.07.02B(4); COMAR 07.02.26.02B(4). The information contained in these records may be accessed and used by the SSA and by any local departments and law enforcement personnel investigating reports of suspected child abuse or neglect. § 5–714(c). Article 88A § 6 provides, in pertinent part, that it is unlawful to disclose these records, with several exceptions:

(a) *In general.*—Except in accordance with a court order or to an authorized officer or employee of the State, another state or local government, or the United States, or a fiduciary institution having a right thereto in an official capacity, and as necessary to discharge responsibilities to administer public assistance, medical assistance, or social services programs, it shall be unlawful for any person or persons to divulge or make known in any manner any information concerning any applicant for or recipient of social services, child welfare services ... directly or indirectly derived from the records, papers, files, investigations or communications of the State, county or city, or subdivisions or agencies thereof, or acquired in the course of the performance of official duties.

(b) *Child abuse or neglect.*—Except as otherwise provided in Title 5, Subtitle 7 of the Family Law Article, all records and reports concerning child abuse or neglect are confidential, and their unauthorized disclosure is a criminal offense subject to the penalty set out in subsection (e) of this section. Reports or records concerning child abuse or neglect may be disclosed only:

(1)(i) Under a court order; or

(ii) Under an order of an administrative law judge, if the request for disclosure concerns a case pending before the

office of administrative hearings and provisions are made to comply with other State or federal confidentiality laws and to protect the identity of the reporter or other person whose life or safety is likely to be endangered by disclosure;

(2) To personnel of local or State departments of social services, law enforcement personnel, and members of multidisciplinary case consultation teams, who are investigating a report of known or suspected child abuse or neglect or who are providing services to a child or family that is the subject of the report;

(3) To local or State officials responsible for the administration of the child protective service or child care licensing and regulations as necessary to carry out their official functions;

(4) To a person who is the alleged child abuser or the person who is suspected of child neglect if that person is responsible for the child's welfare and provisions are made for the protection of the identity of the reporter or any other person whose life or safety is likely to be endangered by disclosing the information;

(5) To a licensed practitioner who, or an agency, institution, or program which is providing treatment or care to a child who is the subject of a report of child abuse or neglect for a purpose relevant to the provision of the treatment or care;

(6) To a parent or other person who has permanent or temporary care and custody of a child, if provisions are made for the protection of the identity of the reporter or any other person whose life or safety is likely to be endangered by disclosing the information;

(7) To the appropriate public school superintendent for the purpose of carrying out appropriate personnel actions following a report of suspected child abuse involving a student committed by a public school employee in that school system; or

(8) To the director of a licensed child care facility or licensed child placement agency for the purpose of carrying

out appropriate personnel actions following a report of suspected child neglect or abuse alleged to have been committed by an employee of the facility or agency and involving a child who is currently or who was previously under that facility or agency's care.

*See also* COMAR 07.02.07.23A. In addition, an individual applying to work or volunteer with children may request, in "a timely, notarized request," that a local department notify a third party "of whether the applicant is identified in the local department's records as an indicated child abuser or neglector." COMAR 07.02.07.23G.

In 1987 and, as we have noted, prior to the enactment of the provisions providing for the limited Chapter 318 hearings, the Legislature created certain protections for persons suspected of abuse or neglect prior to the entry of their names into a central registry. These procedural safeguards are now codified at section 5–715:

(b) *Notice of entry of name in central registry.*—Before the name of a person who is suspected of abuse or neglect is entered in a central registry, the person shall be given notice.

(c) *Hearing to appeal entry of name in central registry required; exception.*—(1) Except as provided in paragraph (3) of this subsection, on request by a person suspected of abuse or neglect, the Department shall hold an administrative hearing for the purpose of allowing the person to appeal the entry of the person's name in a central registry.

(2) The hearing shall be held in the county in which the person suspected of abuse or neglect resides.

(3) The name of a person adjudicated a child abuser may be entered in a central registry without an opportunity for a hearing under this subsection.

(d) *Requirements for entry of name in central registry.*— The Department may not enter the name of a person in a central registry unless the person has:

(1) been adjudicated a child abuser;

(2) unsuccessfully appealed the entry of the person's name in the central registry under procedures established by the Department and this section; or

(3) failed to respond within 15 days to notice by the Department of the Department's intent to enter the person's name in a central registry.

*See also* 1987 Md. Laws, Chap. 635.

We addressed the procedural safeguards provided by section 5–715 to persons suspected of child abuse or neglect prior to the entering of their names on a "central registry" in *C.S.*, 343 Md. at 33, 680 A.2d at 480, and there held that section 5–715 provides those individuals a right to a contested case hearing before DHR or a local department can enter their names into a central registry. According to the affidavit of Stephen Berry, Acting Director of the Office of Family and Children's Services of the Social Services Administration, in reaction to our opinion in *C.S.* and "[r]ather than offering all individuals on the Central Registry full administrative hearings," the Department deactivated the formal Central Registry. Accordingly, the Department, on its own accord, ceased entering names on the Child Abuse and Neglect Central Registry in 1996 and effectively disbanded that particular system.

### 4. The AMF and CIS Registries

As recognized by the local departments in their brief, "[a]lso considered part of the agency's record are the coded entries in the AMF and CIS." [9] The departments go on to describe the evolution of the AMF:

Since the 1940s, prior to local departments having responsibility for CPS [Child Protective Services], DHR and local departments have maintained "lists" of their clients. Prior

---

9. Although the CIS is the most recent update of the AMF system, it contains the same information. MCDSS states in its brief that for the purposes of this appeal, the AMF and CIS database systems are identical. We shall refer to these registries interchangeably throughout this opinion.

to automation, this was done by use of a centralized index card filing system known as the "Master File." When the Master File was automated in 1986, it was renamed the "Automated Master File" or AMF. [Citations omitted.]

In his affidavit for the *L.D.* case, Acting Director Berry further described the AMF and CIS database systems:

The AMF, which still operates in many jurisdictions, is accessible to all local departments. The AMF contains coded information about any individual who has applied for or received benefits or services through a DHR program anywhere in the state. As with the Master File, local departments use the AMF to locate active and closed case records; determine what DHR benefits or services individuals have applied for or received; monitor case activity; and extract limited demographic information about individual applicants and recipients. The AMF also generates the data DHR requires for various statistical reports.

In the early 1990s, DHR began development of a new computer system, CIS. Local departments in all but the largest jurisdictions now use CIS to track clients and services. While CIS jurisdictions still have access to the AMF, they enter new data and cases directly into CIS. The same kinds of data are recorded in both systems.

In both the AMF and CIS, "child protective services" provided in response to a report of child abuse or neglect are catalogued, as other services, under a "case head," usually the female head of the household. Under the case head, local departments enter the names of family members, including the child and other relatives by blood, adoption, or marriage, and of household members. In the case of alleged abuse or neglect, household members include all individuals who lived with the child or were a regular presence in the child's home. Any other individuals significant to the provision of services are identified as "associates" and coded with a reference to their relationship to the case head.

The particular services provided to a family are identified in the AMF or CIS by a code. In the case of reported child abuse or neglect, a service code 'for child protective services is entered into the AMF or CIS for the case head as well as for every household or family member or associate. An additional code identifies the alleged maltreatment (physical abuse, sexual abuse, or neglect) and disposition of the investigation ("indicated," "unsubstantiated," or "ruled out").

. . . .

Access to the AMF and CIS is limited. In both systems, access is controlled by the use of passwords provided *only* to certain local department and DHR employees for whom access is necessary to perform their jobs.

Acting Director Berry went on to describe the now defunct Central Registry. He stated that the Central Registry initially was accessible to public and private agencies and that it was not until 1977 that the Legislature "prohibited the Department from entering a person's name into 'the Child Abuse Central Registry' unless he or she had been 'adjudicated a child abuser' or had been offered an administrative hearing." *See generally* 1977 Md. Laws, Ch. 504. Berry noted that in 1981, because of the stigmatizing effect on a family or child and the intrusive nature of the appeals process, the Legislature limited access to the Central Registry to individuals specifically involved in child abuse investigations: "protective services staff of the Social Services Administration, protective services staff of local departments of social services, who are investigating a report of suspected child abuse, . . . and law enforcement personnel who are investigating a report of suspected child abuse." 1981 Md. Laws Ch. 770 (showing additions and deletions). *But see* COMAR 07.02.07.23A, *supra.*

In 1987, at the request of the Department, the Legislature again amended provisions regarding the Central Registry and clarified that the maintenance of the Central Registry was discretionary rather than mandatory. *See* 1987 Md. Laws Ch. 635 (now codified with amendments at § 5–714(a)). Accord-

ingly, in the late 1980s, the Department deactivated the Central Registry. It was reactivated briefly after the passage of the Chapter 318 hearings process, "[b]ased on [DHR's] understanding that the Chapter 318 appeal procedures would satisfy, as well, the hearing requirements of section 5–715." That interpretation proved incorrect when this Court held in *C.S.*, 343 Md. at 33, 680 A.2d at 480, that section 5–715 required that individuals be offered full contested case hearings, not simply the limited Chapter 318 hearings, prior to the entry of their names on the Central Registry. As we have stated, in reaction to that decision and rather than offering full contested case hearings, the Department again deactivated the Central Registry. At no time has DHR offered individuals full administrative "contested case" hearings to challenge the entry of their names on the AMF or CIS.

The AMF is defined by the DHR in its regulations as an "automated electronic system that maintains data related to services provided by a local department." COMAR 07.02.07.02B(3). The AMF also has been referred to as "a statewide, comprehensive database containing records of all cases, including those of suspected child abuse, which are handled by local departments of social services." Senate Judicial Proceedings Committee, Floor Report for House Bill 617, at 2 (1993); Senate Judicial Proceedings Committee, Bill Analysis for House Bill 617, at 1 (1993). The local departments assert that "[t]hese databases serve as computerized indices of all of the agency's files, only a small percentage of which involves [Child Protective Services]. By 'running' a name, a local department can determine whether [it or] any [other] local department has served or assisted an individual or household and the status of such involvement." The local departments contend that the AMF and CIS systems are not central registries because they are "not 'designed solely to list the names of adjudicated child abusers.'" *C.S.*, 343 Md. at 22, 680 A.2d at 474 (quoting Bill Analysis for House Bill 617, at 2).

In the *L.D.* case, the circuit court below determined that, as matter of law, "the AMF and CIS databases operated by the Montgomery County Department of Social Services and the

State Department of Human Resources constitute a "central registry" as contemplated by Md.Code Ann. Family Law Art., §§ 5–714 and 5–715 (1990 & Supp.1996)." In reaching this determination, Judge Mason, in an excellent opinion, explored the factual background and described the AMF and CIS databases:

> The precursor to the AMF was the Master File index card systems maintained by each individual local department since the 1940s. These systems were unique to each department and kept track of only those services rendered by that respective local department. Statistical data from these files was tabulated and sent to DHR on a monthly basis.
>
> In 1986, DHR created the Automated Master File ("AMF") to replace the card system. Unlike the manual card system, the AMF was the filing system for all local departments and made information entered by one local department instantly accessible to all others.
>
> In 1990, DHR updated the AMF with a new system called the Client Information System ("CIS"). The same data is recorded in both systems. The CIS database is now used in all but the largest jurisdictions. Those jurisdictions using the CIS still have access to the AMF.
>
> In both systems, data regarding child abuse and neglect is cataloged under a "case head" and is entered by means of alphanumeric codes. Although the affidavit [of Stephen Berry] does not set out how DSS determines who is the "case head," it does state that the case head is "usually the female head of the household." Nonetheless, all information regarding the case is stored under that name. Included in this information are the identities of all individuals significant to the provision of services along with codes which reveal their relationship to the case head.
>
> In the case of child abuse or neglect, two codes are entered which are of particular importance:
>
> - one signifies that a child protective services investigation has been conducted and identifies the maltreat-

ment alleged in the investigation, *i.e.*, whether it is physical abuse, sexual abuse or neglect; and

- the second identifies the finding of the investigation, *i.e.*, whether it was "ruled out," "indicated," or "unsubstantiated."

These codes appear under the name of each individual listed under the case head regardless of whether that individual is the perpetrator, victim or is otherwise associated with the case. There is no code which explicitly identifies or otherwise singularly applies to the perpetrator.

In addition to submitting the affidavit generally describing the codes and procedures used to enter an individual onto the AMF or CIS, DSS also submitted printouts reflecting the information available on [L.D.]. As for the AMF printouts, this information only reflects that [L.D.] ran a day care home. This is because DSS switched from the AMF to the CIS prior to the allegations of neglect against [L.D.]. DSS entered all case information on the CIS, hence, only the CIS contains child neglect information connected with [L.D.].

The CIS printouts regarding [L.D.] largely confirm the general information regarding the databases summarized above. The information appears in three types of printouts. One printout is the "address" display which contains [L.D.]'s address. The second printout is the "summary" display wherein [D.N.] is listed as the case head with [L.D.'s] spouse, [L.D.'s] children, [the child and the child's mother] all listed under [L.D.'s] name. Next to each name is the code for a child neglect investigation.

The final type of printout is the "client inquiry" display. Each individual, including [L.D.] has a distinct display under their name in which certain information appears. All of these displays for each individual contain the same codes signifying: (1) a child neglect investigation; (2) a finding of "indicated neglect"; (3) the location of the office handling the investigation; and (4) the dates the investigation was opened and closed. Additionally, the displays contain codes

for each individual's relationship to the case head and their date of birth. [Citations omitted; footnotes omitted.]

With the foregoing discussion in mind, we turn now to the case *sub judice.*

### III. Analysis

In this consolidated appeal, we must address the issue left unanswered in *C.S.,* 343 Md. at 34 n. 8, 680 A.2d at 480 n. 8: "[W]hether records stored in the AMF [and CIS] are ... 'central registr[ies]' within the meaning of [section] 5–714." We answer this in the affirmative and hold that because the AMF and CIS registries are statewide, comprehensive databases containing information identifying suspected child abusers, available on a statewide basis, these databases constitute central registries and therefore are subject to the contested case hearing procedures mandated by section 5–715 and *C.S.*

### C.S. v. Prince George's County Department of Social Services

In *C.S.,* 343 Md. at 22, 680 A.2d at 474, the Prince George's County Department of Social Services (PGCDSS) notified C.S. that C.S. had been found responsible for indicated abuse and that it would enter C.S.'s name on the Child Abuse and Neglect Central Registry. C.S. received only a limited Chapter 318 hearing, not a contested case hearing. The ALJ upheld the local department's finding.

C.S. filed a petition for judicial review in the Circuit Court for Prince George's County. PGCDSS moved to dismiss that petition, arguing that the child abuse statute did not specifically provide for judicial review and that the APA, which provides for judicial review in some cases, did not apply to findings of indicated child abuse. The circuit court agreed with the PGCDSS and granted its motion.

After an exhaustive review of the legislative history and evolution of Maryland's Child Abuse and Neglect statute and regulations, we reversed the circuit court and

conclude[d] that [sections] 5–706.1 and 5–706.2, which implement Chapter 318 hearings, are only applicable to a review of the local department's records. Section 5–715[, however,] provides an alleged abuser with a separate and independent right to an administrative hearing before his or her name may be entered into a central registry. We further h[e]ld that the hearing under [section] 5–715 qualifies as a "contested case" hearing under the APA, and that it was improper to provide C.S. with only the limited hearing specified by Chapter 318.

*Id.* at 23–24, 680 A.2d at 475.

Integral to our holding in *C.S.* was the developmental history of the statutory and regulatory provisions relating to central registries. We described the various procedural safeguards the Legislature incorporated into the child abuse statute over the years and determined that the Legislature's enactment of those provisions

evidence[s] a deep concern on the part of the legislature to give individuals alleged to have committed child abuse or neglect an opportunity to clear their name. This history also demonstrates the legislature's concern that before information relating to alleged child abuse can be disseminated state-wide, that information must have been demonstrated to be accurate either through adjudication or an administrative hearing. Clearly, [sections] 5–701 to 5–715 grant broad authority to social services and law enforcement agencies to investigate and prosecute cases of child abuse and to prevent its recurrence. At the same time, the legislature has also shown that this authority must be tempered to ensure that individuals are not labeled as child abusers on the basis of inaccurate or incomplete information.

*Id.* at 30, 680 A.2d at 478. *See also id.* at 24–30, 680 A.2d at 475–78 (describing in detail and analyzing the legislative history of the child abuse statute over the past thirty years).

We then went on to discuss the history behind Chapter 318 hearings and described the Legislature's enactment of sections

5–706.1 and 5–706.2 as "a new avenue of procedural protection ... [for] allowing alleged abusers to request administrative review of the *findings* made by a local department." *Id.* at 28, 680 A.2d at 477 (emphasis added). Finally, we discussed the Legislature's amendment of section 5–715 in Chapter 318, which broadened that provision's scope by replacing each reference to "the central registry" in section 5–715 to "a central registry." We noted the significance, stating: "Following this amendment, [section] 5–715's right to a hearing clearly applies to *all central registries* in Maryland, not one single central registry." *Id.* at 29, 680 A.2d at 478 (emphasis added). Thus, we recognized in *C.S.* that the fundamental distinction between the Chapter 318 protections and the protections previously provided in section 5–715 was that a Chapter 318 hearing was created to allow those found to have committed abuse or neglect to challenge those findings, even if their names are not to be placed on a central registry. Section 5–715, however, continues to provide procedural safeguards for those accused of abuse or neglect before their names can be entered into a central registry.

Having noted the distinctions between the two types of hearings, we then went on in *C.S.* to analyze how those hearings actually were conducted. We concluded that DHR regulations provided only a limited Chapter 318 type hearing for the distinctly different appeals the departments were to provide under section 5–715. *See id.* at 31, 680 A.2d at 478. Accordingly, we struck down these regulations because they failed

> to properly implement the legislative scheme because the Chapter 318 hearing was created by the legislature as a new and independent means of review [for a local department's findings only]. Thus, Chapter 318 hearings were intended to supplement, rather than replace, the pre-existing administrative review of an agency's decision to enter a person's name on a central registry, available under [section] 5–715.

*Id.* The nature of the hearings required by section 5–715, we then determined, were contested case hearings under the APA. *Id. See also* SG § 10–202(d)(1) (defining a contested

case hearing as "a proceeding before an agency to determine a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing."). One of the elements of a contested case hearing, we said, "is whether the entity conducting the hearing acts in an adjudicatory capacity, *i.e.* by determining the facts of a case and applying those facts to some legal standard in order to reach a conclusion." *Id.* at 32, 680 A.2d at 479 (citing *Sugarloaf Citizens Ass'n v. Northeast Waste Disposal Auth.*, 323 Md. 641, 653, 594 A.2d 1115, 1121 (1991) and *Medical Waste Assocs. v. Maryland Waste Coalition, Inc.*, 327 Md. 596, 609, 612 A.2d 241, 247 (1992)). During the course of a section 5–715 hearing, the ALJ must answer the sole question of "whether the alleged incident of abuse or neglect is correctly labeled as 'indicated' or 'unsubstantiated,'" *C.S.*, 343 Md. at 33, 680 A.2d at 479. In order to reach that determination, the ALJ must "sift between potentially conflicting information presented by the DHR and the alleged abuser to determine" whether the DHR's label is correct. *Id.* We held, therefore, that the Legislature intended that this appeal process be conducted as an administrative contested case hearing under the APA. Accordingly, section "5–715 entitles [persons accused of child abuse or neglect] to a contested case hearing before the DHR or [local department] can enter [the accused's] name on a central registry created under [section] 5–714." *Id.* at 34, 680 A.2d at 480 (footnote omitted).

### Statutory Interpretation

Having discussed the backdrop of *C.S.*'s requirement that a contested case hearing be held before an individual's name can be entered on a central registry, we must now address whether the AMF and CIS databases currently in use by the local departments constitute central registries, thereby requiring the same contested case procedures.

We have said that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d

423, 429 (1995). Legislative intent must be sought in the first instance in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace*, 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn*, 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks*, 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck*, 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss*, 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. *Marriott Employees*, 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. City of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County*, 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

In *Tracey v. Tracey*, 328 Md. 380, 387, 614 A.2d 590, 594 (1992), however, this Court opined, in reference to construing an alimony statute:

> While the language of the statute is the primary source for determining legislative intention, the plain meaning rule of construction is not absolute; rather, the statute must be construed reasonably with reference to the purpose, aim, or policy of the enacting body. The Court will look at the larger context, including the legislative purpose, within which statutory language appears. Construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided. [Citations omitted.]

Because we have already held in *C.S.* that the Legislature intended contested case hearings to be held before individuals can be listed on a central registry, the question germane to the issue at hand is the plain meaning of or what constitutes a "central registry."

 The Child Abuse and Neglect statute uses but does not define the phrase "central registry." As stated, *supra*, however, a definition can be found in DHR's regulations:

> "Central registry" means a centralized listing of individuals identified in the local department of social services written findings of an investigation of suspected abuse or neglect, pursuant to Family Law Article, § 5–701 et seq., Annotated Code of Maryland, as responsible or allegedly responsible for causing the injury, harm, or substantial risk of harm to a child.

COMAR 07.02.07.02B(4). *See also* COMAR 07.02.26.02B(4). In THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 240 (1983), "central" is defined as "constituting that from which other related things proceed or upon which they depend." "Centralize" is defined as "to draw or to gather about a central or central point" or "to bring under one control, esp. in government." *Id.* "Central" likewise is defined in the MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 186 (10th ed. 1996) as "easily accessible from outlying districts." "Registry" is defined as "an official record book." *Id.* at 985. Taking into consideration the dictionary meanings of the terms "central" and "registry," along with the regulatory definition of "central registry," we believe that the plain meaning of "central registry" is a list of reported instances concerning individuals identified by local departments as suspected of child abuse or neglect that is centrally stored and centrally accessible from outlying areas.

 The AMF and CIS database systems clearly are central registries within the plain meaning of sections 5–714 and 5–715. First, the information stored on the databases is accessible statewide. Using either the AMF or CIS, the local departments input information relating to reports of alleged abuse or neglect from their separate locations, and this information is stored in the databases' memory banks. Likewise, the information stored is retrievable by any local department throughout the State. In fact, all local departments are required, upon receiving a report of child abuse, to "check the Central Registry, AMF, or CIS, and any available case rec-

ords for any information about any other services currently being offered or previously offered by the local department to the child, caretaker, or household or family member." CO-MAR 07.02.07.06I.

The local departments in the case *sub judice* argue that the mere maintenance of a computerized index of its cases, "in which no individual is *identified* as an alleged maltreator, does not trigger the hearing right set forth in [section] 5–715." (Emphasis added.) Moreover, the departments contend these databases were not created to store lists of child abuser or neglect offenders; rather, they are indices of all services provided by the local departments.

As we perceive their first argument, the local departments assert that because the AMF and CIS registries do not denote specifically who among the individuals listed on the registry as associated with the incident is the perpetrator, this scheme does not enable others accessing the records to discern from the list who committed the abuse or neglect. We disagree. Under section 5–701(b) and under DHR's own regulations, abuse can be committed only by a parent, a person responsible for the child's supervision or having permanent or temporary care or custody of the child, or a household or family member. *See* § 5–701(b) and COMAR 07.02.07.02B(6). Neglect can be committed only by a parent or person responsible for the child's supervision or having permanent or temporary care or custody. *See* § 5–701(p) and COMAR 07.02.07.02B(7)(a). The statute and these regulations narrow who among the list of individuals associated with the incident can be a perpetrator. Furthermore, the AMF and CIS display the particular finding resulting from the investigation, as well as the ages of the individuals, so one reviewing the record easily can discern who on the record is an adult and who is a child. Therefore, anyone reading a record can learn that the perpetrator is one of the adults listed who necessarily must fall into the relationship categories described above.

To the extent the local departments presuppose that many individuals associated with the incident will be listed on the

record, thereby decoying the real perpetrator, this may not be the case. If, for example, an anonymous report of abuse involved a single parent and one child, someone reviewing records related to this incident on the AMF or CIS could infer easily from that record who is the parent listed on the registry. Additionally, the reviewer can discern that the child and parent are entered in the database because of a finding of indicated or unsubstantiated abuse or neglect because no other persons are listed and from the disposition of the case therefore can infer that the parent is responsible for the abuse or neglect. Accordingly, we believe the AMF and CIS regis- tries sufficiently identify individuals suspected by local departments of abuse or neglect within the meaning of section 5–715.

Although the primary reason for the creation of the Central Registry in 1966 was to track individuals allegedly responsible for child abuse or neglect, we have found no indication by the Legislature that it intended the only central registry in Maryland to be the Child Abuse and Neglect Central Registry then extant. Simply because the local departments store a wide variety of information on the AMF or CIS registries relating to other services offered their clients, that alone does not render those databases any less of a central registry for the purpose of identifying child abusers or neglectors. Although the information entered into the AMF or CIS documents any services that any individuals have received, a necessary subset of those records is services provided by child protective services for cases of abuse or neglect. What is more, in his affidavit, Acting Director Berry asserts the data which had previously been available from the Central Registry was "equally available through the AMF." Simply because the primary purpose of the AMF or CIS was not to list those found responsible for the abuse or neglect of a child does not mean those databases, or at least the relevant portions of abuse and neglect records stored on the databases, do not constitute central abuse and neglect registries.

In addition to our interpretation that the AMF and CIS databases constitute central registries under the plain meaning of the statute, legislative history supports this interpreta-

tion. For instance, in addition to creating a new hearing procedure for challenging local department findings, the Legislature broadened the scope of section 5–715 with Chapter 318 by replacing "the" central registry with "a" central registry. This modification clearly shows that the Legislature no longer intended, if it ever had intended, to limit the statute's applicability to the Child Abuse and Neglect Central Registry, which sometimes had been deemed "the" child abuse and neglect registry, meaning the most widely used or most complete registry of child abusers or neglectors in this state. Instead, the Legislature amended the statute to reflect the need to protect persons before they are entered on any central registries. As we have stated, "[f]ollowing this amendment, [section] 5–715's right to a hearing clearly applies to all central registries in Maryland, not one single central registry." *C.S.*, 343 Md. at 29, 680 A.2d at 478.

The local departments argue that the Legislature did not intend to broaden the term "central registry" in Chapter 318 to trigger both contested case hearings under section 5–715 and the hearings of limited review as set forth in sections 5–706.1 and 5–706.2, because it twice rejected a comprehensive definition of central registry that would have included the AMF and CIS registries:

"Central Registry" means any file, database, record, or other information source that is made or kept by a local department or the Department and contains information on child abuse and neglect cases. "Central Registry" includes the following, whether or not centrally located: A manual file or automated data file; and all reports and records of suspected child abuse and neglect maintained by a local department or the Department.

1992 House Bill 1016, section 1. *See also* 1993 Md. Laws, Chap. 318 (showing strike-outs amending bill to delete same language defining "central registry"). The local departments contend the Legislature's omission of this proposed definition shows that the Legislature specifically rejected the notion that the AMF and CIS were central registries. We do not believe this to be the case. First, our review of the legislative files for

House Bill 1016 and House Bill 617 revealed no specific opposition to the contemplated definition of "central registry" based on the inclusion of the AMF or CIS as central registries. Rather, some parties expressed concern over the definition including as part of a central registry every "file, database, record, or other information source ... made or kept by a local department or the Department" pertaining to child abuse or neglect cases. In a letter to Delegate Donald Elliot about the proposed amendments to the child abuse and neglect statute, an assistant attorney general wrote that the definition of central registry in House Bill 1016 essentially would define all files kept by the Department as a central registry. Furthermore, this definition would create "a right to notice and an opportunity for a hearing for every person who is reported to a local department for child abuse or neglect." Letter from Kathryn M. Rowe, Assistant Attorney Gen., to Hon. Donald B. Elliott of Mar. 2, 1992, at 3. *See also* Letter from Patricia M. Mannion, Ass'n of Social Services Directors, to John S. Arnick, House Judiciary Comm. of Feb. 26, 1992 (opposing House Bill 1016 because "by redefining central registry as 'any file, data base record or other information source,' the definition of central registry is greatly expanded, ... resulting in a heavy burden on staff time in providing 'fair hearings.' ").

More importantly, although it rejected the comprehensive definition of "central registry," the Legislature also chose not to alter the status quo by supplying another, more limited definition. Rather, the Legislature, aware of the *Hodge*[10] court's interpretation that "a central registry" included the AMF and CIS, specifically did not attempt to modify this interpretation. Therefore, we find more persuasive that the Legislature, knowing of the *Hodge* interpretation, accepted this definition of "central registry." See Senate Judicial Pro-

---

**10.** *Hodge v. Carroll County Dep't of Social Services*, 812 F.Supp. 593 (D.Md.1992), *rev'd on other grounds, Hodge v. Jones*, 31 F.3d 157 (4th Cir.), *cert. denied*, 513 U.S. 1018, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994), to be discussed in greater detail, *infra.*

ceedings Committee, Floor Report for House Bill 617, at 2 (1993), *infra*.

### Hodge v. Carroll County Department of Social Services

The United States District Court for the District of Maryland already has held that the AMF and CIS constitute central registries within the meaning of section 5–715. In *Hodge v. Carroll County Department of Social Services*, 812 F.Supp. 593 (D.Md.1992), *rev'd on other grounds, Hodge v. Jones*, 31 F.3d 157 (4th Cir.), *cert. denied*, 513 U.S. 1018, 115 S.Ct. 581, 130 L.Ed.2d 496 (1994), the plaintiffs, individually and on behalf of their son, Joseph Hodges, filed a federal section 1983 [11] claim against the Carroll County Department of Social Services (CCDSS). The claim arose out of an incident in which the Hodges took their son to the Carroll County General Hospital to examine and treat swelling in Joseph's right arm. The doctor who initially diagnosed Joseph's condition believed it to be "a broken right ulna 'without adequate historical explanation,'" and referred the case to CCDSS as an incident of suspected child abuse. *Hodge*, 812 F.Supp. at 597.

The next day, a CCDSS social worker began an investigation of the reported abuse. After interviewing the Hodges and other individuals, and finding no evidence of abuse, the social worker classified the Hodge case as "unsubstantiated" and "ruled out," and filed a report with CCDSS. CCDSS then filed its report on the AMF.

Not satisfied with first diagnosis of Joseph's condition, the Hodges took their son to another doctor. This doctor diagnosed the condition as osteomyelitis, a bacterial bone infection, and treated the condition. Mrs. Hodge later contacted CCDSS and notified them of Joseph's infection, pointing out that child abuse could not have caused the injury to Joseph's arm.

---

11. 42 U.S.C. § 1983 (1988).

The Hodges later requested that CCDSS permit them to inspect their case files in order to ensure that CCDSS correctly noted the disposition of the case. Instead of allowing them to review the file, the Assistant Director of CCDSS forwarded to the Hodges a summary of the case and notified them that their names had been entered on the AMF. Skeptical of the CCDSS, and how the Assistant Director handled the case file, and also concerned over the ramifications of their inclusion on the AMF, the Hodges asked the Director of DHR for assistance. She responded that according to Maryland's confidentiality provisions, she could not disclose to the Hodges the case file's contents.

In evaluating whether the procedural safeguards provided in section 5–715 applied to the AMF system, the federal district court made specific findings as to why the AMF was a central registry [12] under Maryland law:

> The individual defendants insist that the AMF is not a central registry because it is not a system designed solely to list the names of adjudicated child abusers, and because it does not identify any person as a suspected child abuser.... [T]hat argument apparently confuses the general term "central registry" with the specific [Child Abuse and Neglect Central Registry]. Clearly, any computerized data base that includes records of cases of suspected child abuse is a "central registry" under Maryland law. Of course, the [Child Abuse and Neglect Central Registry] is an example of a "central registry." Similarly, the AMF also is a "central registry."

---

**12.** As of the date of the *Hodge* opinion, "central registry" was then defined in DHR regulation 07.02.07.02B(1) as "a registry of all reported cases of suspected child abuse and neglect maintained in the Social Services Administration." The definition has since been amended and renumbered. *See* COMAR 07.02.07.02B(4). *See also* 07.02.26.02B(4). While the federal district court relied on the older definition in its determination that the AMF and CIS are central registries within the meaning of sections 5–714 and 5–715, we believe the analysis in *Hodge* remains persuasive, particularly given that court's comments that the AMF sufficiently identifies those suspected of abuse or neglect, an element required in the current regulation. *See Hodge,* 812 F.Supp. at 604.

. . . .

The defendants argue further that because the AMF does not identify any persons as "suspected child abusers," the AMF is not a central registry and [section] 5–715 does not apply. Under Maryland law, however, the AMF *is* a central registry. Additionally, with regard to the defendants' initial position, exactly the opposite conclusion follows from the facts presently in the record. CCDSS provides [child protective services] only in cases of suspected child abuse. *See* COMAR 07.02.07.03A. Further, applicable regulations define "child abuse" generally as physical injury or sexual molestation inflicted on a child either by a parent or by a guardian. COMAR 07.02.07.02B(3).[13] Therefore, every record of [child protective services] on the AMF is a record of a case of suspected child abuse. Indeed, several of the documents in the Hodges' physical case file labeled "Report of Suspected Child Abuse" leave no doubt about the nature of [the DSS social worker's] investigation in this case. Finally, even in a record of "unsubstantiated" child abuse, it requires no great leap of faith to conclude that at least one of the parents or guardians listed in the record is suspected of child abuse, regardless of whether the record identifies them explicitly in that way, and the plaintiffs have submitted affidavits from several former DSS employees to support such a conclusion.

*Id.* at 603–04.[14] Although we are not bound by the federal district court's interpretation of the term central registry, we

---

13. This provision is now codified in COMAR .07.02.07.02B(6).

14. As a side note to the *Hodge* case, we think it not insignificant that the federal district court noted that

upon unsealing the Hodges' [child protective services] case file, it was discovered that between January 23, 1989, and January 21, 1992, the alphanumeric codes on the computerized data base component of the AMF described the Hodges' case as one of indicated sexual child abuse, meaning that the CCDSS investigation discovered "credible and specific evidence, which has not been satisfactorily refuted," showing either that "[s]exual abuse had occurred and was committed by a caretaker or household or family member," or that "[t]here are physical or behavioral indications that a child has been sexually

find its definition in its opinion persuasive. We also cited this case without disapproval in *C.S.*, 343 Md. at 22 n. 2, 680 A.2d at 474 n. 2.

More importantly, the Legislature also apparently found the federal court's interpretation persuasive. The Legislature stated that it devised the Chapter 318 hearing procedures and created a mechanism aside from the appeal procedures to be provided prior to listing individuals on a central registry because of the circumstances surrounding the Hodges' plight. Specifically, Chapter 318's enactment was "intended to more fully protect persons who are wrongly accused of child abuse or neglect by allowing them to avoid placing sole reliance on *Hodge* and by creating another mechanism by which they can contest the findings and investigations carried out by local departments of social services." Senate Judicial Proceedings Committee, Floor Report for House Bill 617, at 2 (1993); Senate Judicial Proceedings Committee, Bill Analysis for House Bill 617, at 2 (1993).

What is more, the legislature not only was aware of the federal district court's interpretation of "central registry," it did not alter any of the bill's wording to contradict that interpretation. In a letter from Delegate Donald B. Elliot, a sponsor of the bill, to the Members of the Judiciary and Judicial Proceedings Committees, with a copy of the *Hodge* opinion attached, Delegate Elliot wrote: "Kindly note—starting on page 8—Judge Herbert Murray's reaffirmation of the fact that the Automated Master File (AMF) at DHR *is* a central registry and those persons on the file are entitled to the protections of Family Law Article 5–715 which includes a fair hearing." Letter from Delegate Donald B. Elliot to Members of the Judiciary and Judicial Proceedings Committees of Feb. 8, 1993. Likewise, in the Floor Report and in the Bill Analysis of House Bill 617, after noting that the defen-

---

abused...." There is no evidence yet in the record to indicate who changed the computer records to reflect the proper disposition of the Hodge's case, or why three years passed before such a change was made.

*Hodge,* 812 F.Supp. at 603 n. 5 (citation omitted).

dants in *Hodge* asserted that the AMF was not a central registry, the documents went on to state that "[t]he federal court, however, found that the AMF should be considered a 'central registry.' " *See* Floor Report at 2; House Bill at 2. Had the Legislature decided to reject this definition and choose a different definition of the phrase "a central registry," it clearly could have done so.

The local departments aver our interpretation would render the Legislature's provision for Chapter 318 hearings meaningless and nugatory because any entry on the AMF or CIS would require the departments to hold both Chapter 318 hearings and contested case hearings. Although it is true that one found responsible for indicated or unsubstantiated abuse or neglect and also listed by a local department on the AMF or CIS would be entitled to both forms of hearings, that hardly renders Chapter 318 hearings, as codified in sections 5–706.1 and 5–706.2, useless. The purpose of the Chapter 318 proceeding has been made clear: to allow an individual to contest the local department's findings of indicated or unsubstantiated abuse or neglect. If the local departments choose not to list an alleged perpetrator on the AMF or CIS, then the only hearing required is one pursuant to sections 5–706.1 and 5–706.2. Stated another way, Chapter 318 hearings are

> intended to more fully protect persons who are wrongly accused of child abuse or neglect by allowing them to avoid placing sole reliance on *Hodge* and by creating another mechanism by which they can contest the findings of investigations carried out by local departments of social services. *This bill stands apart from the notice and hearing provisions concerning central registries, thereby giving persons a clear and independent basis from which to contest findings of investigations into alleged child abuse and neglect.*

Senate Judicial Proceedings Committee, Floor Report for House Bill 617, at 2 (1993); Senate Judicial Proceedings Committee, Bill Analysis for House Bill 617, at 2 (1993) (emphasis added). Chapter 318 merely provides to the suspected abuser another means for review; it was not intended to replace section 5–715 rights afforded individuals. The

primary impact of House Bill 617, passed by the Legislature as Chapter 318, upon 5–715 was to change the terminology "the central registry" to "a central registry." In making this change, the Legislature may well have anticipated the Department's attempt to avoid the necessity for such hearings.

The local departments also argue that our holding in this case

> means that CPS workers will not be able to enter any data into the AMF or CIS relating to an open investigation until after giving notice of and completing an evidentiary hearing. As a result, CPS workers will have no ability either to alert other staff when they have begun an investigation or to determine whether another investigation is already underway. This result . . . would cripple the local departments' ability to protect children from abuse and neglect.

We believe the Legislature has spoken on the issue, and it is clear it sought a balance between the critical need to investigate and prosecute child abusers and neglectors and the equally critical need to allow persons accused of abuse and neglect the opportunity to clear their names before dissemination throughout the entire state. Accordingly, the departments' arguments are unpersuasive.

## IV. Conclusion

Taking into consideration the plain meaning of the term "central registry" and the legislative history and purpose of the Child Abuse and Neglect statute, we hold that the term "central registry" includes the AMF and CIS databases now operated by the DHR and local departments. Accordingly, prior to the entry of their names as suspected child abusers and neglectors into these databases, accused individuals must be provided a full contested case hearing and the concomitant right to judicial review in accordance with section 5–715 and our opinion in *C.S.*

Because of our resolution of this issue, it is unnecessary for us to reach the other questions presented by the parties. Accordingly, we shall affirm the order of the Montgomery

County Circuit Court in *Montgomery County Department of Social Services v. L.D.* and reverse the orders of the circuit courts in *T.E.P. v. Anne Arundel County Department of Social Services,* and *D.N. v. Frederick County Department of Social Services.*

THE ORDER OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN APPEAL NO. 75, *MONTGOMERY COUNTY DEPARTMENT OF SOCIAL SERVICES V. L.D.,* IS AFFIRMED; THE ORDER OF THE CIRCUIT COURT IN *T.E.P. V. ANNE ARUNDEL COUNTY DEPARTMENT OF SOCIAL SERVICES* IS REVERSED; THE ORDER IN *D.N. V. FREDERICK COUNTY DEPARTMENT OF SOCIAL SERVICES* IS REVERSED; CASES OF *T.E.P. V. ANNE ARUNDEL COUNTY DEPARTMENT OF SOCIAL SERVICES* AND *D.N. V. FREDERICK COUNTY DEPARTMENT OF SOCIAL SERVICES* ARE REMANDED TO THE RESPECTIVE CIRCUIT COURTS FOR FURTHER PROCEEDINGS; COSTS IN EACH CASE ARE TO BE PAID BY THE RESPECTIVE DEPARTMENTS.