855 A.2d 313

**CHARLES COUNTY DEPARTMENT OF SOCIAL SERVICES**

v.

**Charles VANN.**

**No. 87, Sept. Term, 2003.**

Court of Appeals of Maryland.

July 29, 2004.

Sandra Barnes, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for petitioner.

James Brewster Hopewell (Ann M. Gaegler, on brief), Riverdale, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

In this case, we must decide whether the Court of Special Appeals, on judicial review of an administrative agency decision, erred when it held that a parent could not be responsible for indicated child abuse when, in the course of administering corporal punishment, the parent inadvertently injured his son because the child attempted to escape the punishment. The Charles County Department of Social Services found Charles Vann responsible for "indicated child abuse" pursuant to Maryland Code (1999 Repl.Vol., 2003 Cum.Supp.), § 5–701 of the Family Law Article.[1] An administrative law judge (ALJ) upheld the Department's finding and Vann filed a petition for judicial review of the agency decision in the Circuit Court for Charles County. We shall hold that the ALJ's decision was supported by substantial evidence. Accordingly, we reverse the judgment by the Court of Special Appeals.

I.

On May 6, 1999, Charles Vann, respondent, and his wife each received a phone call from the administrators of the daycare center of their six-year-old son. The daycare provid-

---

**1.** All future statutory references to the Family Law Article of the Maryland Code (1999 Repl.Vol., 2003 Cum.Supp.) shall be designated "FL."

ers had called to advise them that their son had brutally punched and kicked a teacher in the stomach. Because the teacher was thought to be pregnant [2] and had suffered serious injuries, the daycare providers sent her to the hospital and demanded that respondent and his wife immediately retrieve their son from the daycare center.

That evening, respondent and his wife discussed the situation. This was not the first time their son had misbehaved violently at the daycare center. Prior to this incident, he had been involved in multiple bouts of fighting with the other students, prompting the providers to transfer him from his original classroom to a new one and, on occasion, to send him home early. Ultimately, the difficulties with the child became so severe that the daycare providers threatened to, and eventually did, expel him permanently from the center.

Respondent and his wife were consternated by their six-year-old's repeated and unrelenting behavioral issues. Previous attempts to modify the child's conduct using a graduated discipline regimen—which included sitting him in a corner for fifteen minutes, banning him from access to his video games, prohibiting him from going outside to play with his friends, and restricting his movements to his bedroom—had resulted only in more clashes with the students and teachers, culminating in the punching incident on May 6.

Both parents agreed that corporal punishment was the appropriate discipline for their son's misbehavior that day. Using his personal belt, respondent, while verbally chastising his son for the incident at the daycare center, struck at his son. But the six-year-old attempted to avoid the blows by running away, hiding under the bed, and grabbing the belt from his father. In the course of the tussle and respondent's attempts to land the blows, respondent struck him in his lower back with the belt buckle, causing a reddish, moon-shaped bruise about an inch in length. In all, respondent struck his son two or three times with the belt.

---

2. As it happens, the teacher was not pregnant.

The following day, respondent's son complained to his teacher of back pain. The daycare providers observed the injuries on the child and reported the matter to Child Protective Services. Eventually, an investigator employed by the local Department of Social Services was called to look into the matter. On May 10, 1999, the investigator interviewed respondent and his wife. On January 13, 2000, the local department advised respondent that he had been charged with indicated child abuse, *see* FL §§ 5–701(b)(1) and 5–701(m); that his name would be submitted to a state centralized registry used for the recording of such findings, *see* FL § 5–714(e); and that he had a right to contest the charge before an administrative court, *see* FL § 5–706.1. *See also Montgomery County v. L.D.*, 349 Md. 239, 707 A.2d 1331 (1998); *C.S. v. Prince George's County Dept. of Social Services*, 343 Md. 14, 680 A.2d 470 (1996).

Respondent exercised his right to the hearing before an administrative law judge under FL § 5–706.1(b), and the hearing took place on July 18, 2000. On August 30, 2000, the ALJ issued her decision, stating as follows:

"The evidence establishes that [respondent] loves his son ... fiercely and wants to raise well-behaved responsible children, which is admirable. The evidence also establishes that [respondent's] actions in swinging a belt with a large metal buckle at a young child who is twisting, hopping, and trying to run away puts the child in danger of sustaining unintended serious injuries. Although [respondent] testified that he was aiming for [his son's] buttocks, he missed the mark and hit [the] lower-mid back area, leaving marks."

"... Wielding a cowhide belt with a 2–3″ metal buckle at a six-year-old child who is frantically trying to get away and out of reach by twisting, turning, and grabbing at the belt is not [justified]. [Respondent's] action injured [the child]. Striking him and causing a half-moon red/purplish mark on his back ... harmed his health and placed him at substantial risk of harm. The substantial risk and potential for such harm was imminent in that if the child had ducked to avoid the belt, the buckle could have struck his eye or teeth,

and could have resulted in more serious, even permanent, injuries. Once an intended target becomes a moving one, it cannot be predicted with certainty where the blows will land."

Based on these findings, the ALJ affirmed the decision of the local department to charge respondent with indicated child abuse.

Respondent filed a petition for judicial review in the Circuit Court for Charles County. The Circuit Court affirmed the findings of the Department of Social Services. In an unreported opinion, a divided panel of the Court of Special Appeals reversed the Circuit Court's decision, holding that respondent could not be held responsible for indicated child abuse when, in the course of administering corporal punishment, he injured his son inadvertently as the child attempted to escape the punishment.

The Court of Special Appeals reasoned that, as a matter of law, respondent's exercise of corporal punishment could not be "transformed" from lawful corporal punishment into unlawful indicated child abuse simply by virtue of the child's disobedience to his parent's order to stand still and accept the punishment. But for the child's independent decision to disobey, the court stated, the punishment would have been lawful, and a parent cannot be held responsible for the injury if the child's action is the "independent intervening cause" of the injury. Dissenting, Judge Deborah Eyler argued that the majority's reasoning was circular, because it determined the corporal punishment lawful without considering the objective reasonableness of the punishment under the totality of circumstances, including factors such as the child's age, size, ability to understand the punishment, and ability to comply. The local Department sought review of the intermediate appellate court's holding, and we granted its petition for writ of certiorari. 378 Md. 613, 837 A.2d 925 (2003).

Petitioner contends that the Court of Special Appeals's holding was tantamount to an exception to "indicated child abuse" for parents who unintentionally injure their child in the

course of administering corporal punishment. Petitioner argues the statutory definition of indicated child abuse, found in FL §§ 5–701(b) and (m),[3] does not contain the exception carved out by the intermediate appellate court. The court, suggests petitioner, confused the definition of indicated child abuse in FL § 5–701 with either that of criminal child abuse, Md.Code (2002, 2003 Cum.Supp.), § 3–601 of the Criminal Law Article,[4] or that of "protective order" child abuse (that is, child abuse sufficient to require a legal protective order for the child, *see* FL § 4–501(b) (defining abuse for Title 4, Subtitle 5 of the Family Law Article, including abuse requiring a protective order); *see also* FL §§ 4–504 to 4–506). Protective order child abuse expressly excludes reasonable corporal punishment, FL § 4–501(b)(2), and criminal child abuse has been held not to encompass reasonable corporal punishment, *see Bowers v. State*, 283 Md. 115, 126–27, 389 A.2d 341, 348–49 (1978), whereas child abuse as defined by FL § 5–701 contains no such disclaimer. Petitioner sees this distinction as crucial, evincing an intent by the Legislature to disregard corporal punishment in the context of FL § 5–701. The Court of Special Appeals, contends petitioner, applied the wrong definition of child abuse and erred as a matter of law because it took into account the fact that respondent was implementing corporal punishment on his recalcitrant son.

---

3. FL § 5–701(b) provides:
 " 'Abuse' means:
 "(1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed; or
 "(2) sexual abuse of a child, whether physical injuries are sustained or not."
 FL § 5–701(m) provides:
 " 'Indicated' means a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur."

4. All future statutory references to the Criminal Law Article of the Maryland Code (2002, 2003 Cum.Supp.) shall be designated "CL."

Respondent counters that the definition of abuse in FL § 5–701 does not foreclose the reasonable use of corporal punishment. Because reasonable corporal punishment is permitted and because respondent's use of force was reasonable, respondent could not be held responsible for child abuse. As evidence of legislative intent, respondent also refers to FL § 4–501, defining child abuse in the context of protective orders, which expressly precludes reasonable corporal punishment from its purview. He argues that the definitions of child abuse in FL §§ 4–501 and 5–701 must be harmonized. Citing the legislative bill file, respondent also argues that the legislative history of FL § 5–701 clearly indicates that parental intent must be considered a factor in determining whether "indicated child abuse" under the statute actually occurred. Finally, respondent asserts the real motive behind petitioner's decision to charge respondent was the agency's desire to keep a record of any parent alleged to have committed child abuse. He contends that such motive is at odds with the policy of the statute the agency is charged with administering.

## II.

As a court sitting in judicial review of an administrative agency decision, this Court reviews the decision in the same posture as that of the courts below. That is to say, we reevaluate the decision of the agency under the same statutory standards as would the circuit court, and we do not employ those standards to reevaluate the decision of the circuit or intermediate appellate court. *See Division of Labor v. Triangle General Contractors, Inc.,* 366 Md. 407, 416, 784 A.2d 534, 539 (2001); *Dept. of Health v. Campbell,* 364 Md. 108, 123, 771 A.2d 1051, 1060 (2001) (noting that it is the final decision at the administrative level, not the decision of the previously reviewing court, which is the focus of each level of judicial review).

Under our holding in *C.S.,* 343 Md. 14, 680 A.2d 470, a challenge to the entry of one's name in a central registry as an "indicated child abuser" pursuant to FL § 5–701 is a contested

case within the meaning of the Maryland Administrative Procedure Act, Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.) § 10–202(d)(1) of the State Government Article.[5] *See Sugarloaf Citizens Assn. v. Northeast Maryland Waste Disposal Authority,* 323 Md. 641, 594 A.2d 1115 (1991). As a contested case in which the agency was acting in its quasi-judicial capacity—as opposed to "quasi-legislative" agency actions, for which a wholly different set of administrative law principles apply, *see* SG § 10–125; *Fogle v. H & G Restaurant, Inc.,* 337 Md. 441, 654 A.2d 449 (1995)—judicial review is governed by SG § 10–222.

■ SG § 10–222(h) sets forth standards of judicial review over agency decisions in contested cases and varies those standards depending on the type of agency determination under scrutiny. *See Spencer v. Board of Pharmacy,* 380 Md. 515, 846 A.2d 341 (2004). With regard to agency factual determinations, the standard of review is whether the finding is "unsupported by competent, material, and substantial evidence in light of the entire record as submitted," also known as substantial evidence review. SG § 10–222(h)(3)(v). Under substantial evidence review of an agency's factual findings, a court is limited to ascertaining whether a reasoning mind could have reached the same factual conclusions reached by the agency on the record before it. *Board of Physician v. Banks,* 354 Md. 59, 67–68, 729 A.2d 376, 380–81 (1999).

■ With regard to agency legal conclusions, judicial review is less deferential to the agency. When an agency makes "conclusions of law" in a contested case, the APA permits the court, on judicial review, to decide the correctness of the agency's conclusions and to substitute the court's judgment for that of the agency's. SG § 10–222(h)(3)(i)—(iv); *Total Audio–Visual Systems, Inc. v. Dept. of Labor,* 360 Md. 387, 394, 758 A.2d 124, 127–28 (2000). Even with conclusions of law, however, an agency's legal interpretation of the statute it adminis-

---

**5.** All future statutory references to the State Government Article of the Maryland Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.) shall be designated "SG."

ters or of its own regulations is entitled to some deference from the courts. *See Jordan v. Hebbville,* 369 Md. 439, 450, 800 A.2d 768, 775 (2002); *MTA v. King* 369 Md. 274, 288–89, 799 A.2d 1246, 1254 (2002).

■ Other agency decisions fall within categories that are neither legal conclusions nor factual findings, *see, e.g., Spencer,* 380 Md. 515, 846 A.2d 341 (explaining judicial review over discretionary functions of the agency), and some fall within both. These latter sort commonly are known as "mixed questions of law and fact" or applications of law to facts: The agency has correctly stated the law and its fact-finding is supported by the record, but the question is whether it has applied the law to the facts correctly. When the agency decision being judicially reviewed is a mixed question of law and fact, the reviewing court applies the substantial evidence test, that is, the same standard of review it would apply to an agency factual finding. *Pollock v. Patuxent,* 374 Md. 463, 469 n. 3, 823 A.2d 626, 630 n. 3 (2003); *Ramsay, Scarlett & Co. v. Comptroller,* 302 Md. 825, 837–38, 490 A.2d 1296, 1302–03 (1985); *Kohli v. LOOC, Inc.,* 103 Md.App. 694, 654 A.2d 922 (1995), *rev'd in part on other grounds and remanded,* 347 Md. 258, 701 A.2d 92 (1997); *Strother v. Board of Education,* 96 Md.App. 99, 623 A.2d 717 (1993).

■ The agency decision reviewed by the Court of Special Appeals and before this Court on certiorari is the ALJ's determination that respondent's

> "[s]triking [the child] and causing a half-moon red/purplish mark on his back ... harmed his health and placed him at substantial risk of harm. The substantial risk and potential for such harm was imminent in that if the child had ducked to avoid the belt, the buckle could have struck his eye or teeth, and could have resulted in more serious, even permanent, injuries. Once an intended target becomes a moving one, it cannot be predicted with certainty where the blows will land."

To determine the proper standard of review, we must first determine whether the agency decision was a legal conclusion,

a factual finding, or a mixed question of law and fact. The Court of Special Appeals considered it a conclusion of law, stating that "we are persuaded that the ALJ erred in concluding *as a matter of law* that the corporal punishment imposed by [respondent] placed his son in 'substantial risk of harm'" (emphasis added). Because it saw the decision under review as an issue of law, the court applied *de novo* review, substituting its view for that of the agency.

We disagree that the issue is solely a legal one. Whether a finding of "indicated child abuse" is permitted by FL § 5–701 when, in the course of administering corporal punishment, the child disobeys the parent and consequently is injured is patently a mixed question of law and fact. When the ALJ concluded that a substantial risk was "imminent," it did so by applying the law, which requires a substantial risk of harm for a finding of indicated child abuse, FL § 5–701(b); C.O.M.A.R. 07.02.07.12, to the facts of the case, the possibility of a swinging metal buckle causing severe injury to a six-year old child.[6]

In *Ramsay*, 302 Md. 825, 490 A.2d 1296, we addressed the standard of review of an administrative agency decision. The Court of Special Appeals had held that the taxing authority's determination on whether a particular corporation was unitary or binary was a conclusion of law, subject to *de novo* judicial review. *Id.* at 837–38, 490 A.2d at 1302–03. We disagreed and held that the question was rather the application of the law to the "established evidence" in the record. Finding no disagreement between the court and the agency regarding the applicable law, we noted the distinction was really about the

"proper application [of the governing law] to the established evidence of record.... [W]hether a business is unitary or separate and distinct for tax purposes ... is not solely a

---

6. Even in the Court of Special Appeals, the dissenting and majority opinions agreed on the applicable law, with Judge Eyler stating that "I do not take issue with most of the majority's general discussion of the applicable law. I disagree, however, with the majority's *application of the law to the facts*" (emphasis added).

question of law; rather, the issue for purposes of appellate review ... is governed by whether, in light of substantial evidence appearing in the record, a reasoning mind could reasonably have reached the conclusion reached by the Tax Court."

*Id.* Notably, we applied the same substantial evidence test for mixed questions of law and fact as we did for purely factual findings by the agency.

Like *Ramsay,* the agency determination—here, that a substantial risk of harm resulted from respondent's swinging of a belt buckle at a six-year old attempting to evade the blows— was an application of law to a specific set of facts. The ALJ's decision was entitled to deferential review, that is, substantial evidence review, and the court should have considered whether the ALJ's application of law to the facts was fairly debatable or whether a reasoning mind could have reached the same conclusions reached by the agency on the record before it. *Pollock,* 374 Md. at 469 n. 3, 823 A.2d at 630 n. 3.

Deferential review over mixed questions of law and fact is appropriate in order for the agency to fulfill its mandate and exercise its expertise. Administering a child abuse statute is the sort of action for which the expertise of agencies is well suited. To discover whether the corporal punishment was lawfully executed, the agency assesses the reasonableness of the punishment not only in light of the child's misbehavior and whether it warranted physical punishment, but also in view of the surrounding circumstances in which the punishment took place, including the child's age, size, ability to understand the punishment, as well as, in the instant case, the minor's capacity to obey his parent's order to stand still while being struck by the belt. *Cf.* FL § 4–501(b)(2) ("Nothing in this subtitle shall be construed to prohibit reasonable punishment, including reasonable corporal punishment, *in light of the age and condition of the child,* from being performed by a parent or stepparent of the child" (emphasis added)).

Although it may not have been unreasonable for respondent to use corporal punishment, the surrounding circumstances,

including respondent's swinging of a belt buckle at a six-year-old frantically trying to get away and out of reach by twisting, turning and grabbing at the belt, amounted to action that could be reasonably deemed by the agency impermissible under the applicable law. As Judge Deborah Eyler aptly noted in her dissent, "[T]he problem with [the court's] reasoning is that it put the cart before the horse." In other words, the court did not consider in its calculus the totality of circumstances surrounding the physical punishment when it decided the corporal punishment was lawful. Instead, the reasonableness of corporal punishment depends not simply on the misbehavior of the child and the amount of force used in the punishment from the parent's perspective, but also on the physical and mental maturity of the child, and the propriety of the decision to use force in circumstances that may increase the potential for serious injury.

These scenarios cannot be adjudicated without considering the law in view of the applicable facts. Because of the fact-dependent nature of such inquiries, it is more desirable for the agency, using its expertise and scrutinizing the evidence before it, to determine whether the risk created by the parent satisfied the child abuse statute. Accordingly, the agency's application of the law must be given deference under the substantial evidence test.

Applying the substantial evidence test, this Court must assess whether a reasoning mind could have reached the conclusion, based upon this record, that respondent's actions created a substantial risk of harm toward his son. The ALJ's considered judgment was that the swinging of the buckle end of a belt at a six-year old who was attempting to run away *did* create such a risk. The record substantiates this finding, and it was not unreasonable. Furthermore, the record establishes that respondent admitted causing the bruise injuries to his son's lower back; that respondent's wife saw the reddish bruise marks herself after the corporal punishment; that respondent continued to swing the belt at the child in spite of the child's frantically running around the room; and that

respondent "missed the mark" of his son's buttocks, hitting instead the lower back with a metal buckle swung at a six-year-old child. The ALJ found that there existed a danger of the belt striking the eyes and teeth as well as an unacceptable level of uncertainty in terms of the potential for the serious injury that is inherent in the swinging of a belt buckle at a moving target. These concerns also were not unreasonable, and the record supports these findings. Therefore, the ALJ's application of the law to these factual findings—that the facts satisfied the requirement of a substantial risk of harm under § 5–701 and C.O.M.A.R. 07.02.07.12—is affirmed under the substantial evidence review applied to such agency decisions.

## II.

We turn to petitioner's arguments that FL § 5–701(b) and FL § 4–501(b) create two separate definitions of child abuse, one for a local department's finding of "indicated" child abuse, FL § 5–701(b), and another for a finding of child abuse sufficient to justify the issuance of a protective order, FL § 4–501(b)(2).[7]

When interpreting a statute, we look first at the plain language of the statute, with a goal to implement the legislative intent. *See Price v. State*, 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003). Ordinarily, where the statutory language is clear and unambiguous, a court's endeavor reaches its end, and the court need only apply the statute as it reads. *Id.*

We begin with the statutory text of the statutes at issue. FL § 4–501(b) defines abuse as follows:

"(1) 'Abuse' means any of the following acts:

---

7. Both parties agree that the definition of *criminal* child abuse is distinct from that of the definition of child abuse found in the Family Law Article. We have elsewhere expounded on the meaning of criminal child abuse. *See, e.g., Bowers v. State*, 283 Md. 115, 127, 389 A.2d 341 (1978); *Fisher v. State*, 367 Md. 218, 275, 786 A.2d 706, 740 (2001); *Anderson v. State*, 61 Md.App. 436, 487 A.2d 294, *cert. denied*, 303 Md. 295, 493 A.2d 349 (1985); *see also Newby v. U.S.*, 797 A.2d 1233, 1242 (D.C.2002).

(i) an act that causes serious bodily harm;

(ii) an act that places a person eligible for relief in fear of imminent serious bodily harm;

(iii) assault in any degree;

(iv) rape or sexual offense under §§ 3–303 through 3–308 of the Criminal Law Article or attempted rape or sexual offense in any degree; or

(v) false imprisonment.

"(2) If the person for whom relief is sought is a child, 'abuse' may also include abuse of a child, as defined in Title 5, Subtitle 7 of this article. Nothing in this subtitle shall be construed to prohibit reasonable punishment, including reasonable corporal punishment, in light of the age and condition of the child, from being performed by a parent or stepparent of the child.

"(3) If the person for whom relief is sought is a vulnerable adult, 'abuse' may also include abuse of a vulnerable adult, as defined in Title 14, Subtitle 1 of this article."

FL § 5–701(b) defines abuse as follows:

" 'Abuse' means:

"(1) the physical or mental injury of a child by any parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member, under circumstances that indicate that the child's health or welfare is harmed or at substantial risk of being harmed; or

"(2) sexual abuse of a child, whether physical injuries are sustained or not."

FL § 4–501(b) defines abuse for Title 4, Subtitle 5 of the Family Law Article, dealing with domestic violence, whereas FL § 5–701(b) defines abuse for Title 5, Subtitle 7 of the same article, dealing with child abuse.

The two statutes, FL § 4–501(b) and FL § 5–701(b), undoubtedly create two different definitions of abuse within their respective subtitles. FL § 4–501(b) reveals a three-part definition of abuse, divided according to the *person* who is being

victimized. Thus, one part of that definition applies to victims in general, FL § 4–501(b)(1); another applies to children victims, FL § 4–501(b)(2); and finally another applies to "vulnerable adults," FL § 4–501(b)(3). On the other hand, FL § 5–701(b) reveals a two-part definition, divided according to the *nature* of the abuse (either physical or sexual), for FL § 5–701(b) applies to children victims alone. Thus, a plain reading of both definitions indicates that they are two separate and distinct definitions of *abuse.*

 Petitioner's argument, however, is not that there are two different definitions of the word "abuse," but rather that the definition of "abuse" in FL § 4–501(b)(2), which applies to children (child abuse), evinces a completely different meaning of child abuse from the one found in FL § 5–701(b). We do not agree.

FL § 4–501(b)(2) adopts FL § 5–701(b)'s definition of child abuse when it defines child abuse by reference to FL § 5–701(b): "If the person for whom relief is sought is a child, 'abuse' may also include abuse of a child, as defined in Title 5, Subtitle 7 of this article [§ 5–701(b)]." Thus, FL § 4–501(b)(2) simply states that when the victim is a child, the term "abuse" as used in Title 4, Subtitle 5 is the same as the definition found in FL § 5–701(b). In fact, FL § 4–501(b)(2) is meaningless apart from FL § 5–701(b) because FL § 4–501(b)(2) does not contain a substantive description of child abuse, only a cross reference to FL § 5–701(b).

Petitioner would have this Court read FL § 4–501(b)(2) to create a completely new, substantive definition of child abuse, based principally upon its second sentence: "Nothing in this subtitle shall be construed to prohibit reasonable punishment, including reasonable corporal punishment, in light of the age and condition of the child, from being performed by a parent or stepparent of the child." Because similar language is not found in FL § 5–701(b), petitioner reasons that FL § 4–501(b)(2) is a definition of child abuse that *excepts* from its purview "reasonable corporal punishment," whereas FL § 5–701(b) does not.

The central premise of this argument is that one definition of child abuse excuses reasonable corporal punishment whereas the other does not. The clear implication is that FL § 5–701(b)(2) *defines child abuse to include some forms of reasonable corporal punishment.* This is an incorrect understanding of Maryland law and of the term "child abuse." Reasonable corporal punishment, by definition, is not child abuse. Therefore, in light of the child abuse statute, there can be no definition of child abuse that includes reasonable corporal punishment. In short, child abuse and reasonable corporal punishment are mutually exclusive; if the punishment is one, it cannot be the other. Petitioner's principal argument, that FL § 4–501(b) is distinguishable from FL § 5–701(b) based upon the exclusion of reasonable corporal punishment from one and not the other, lacks merit.

Petitioner also argues that the Court of Special Appeals erred because it considered whether the respondent's action was reasonable corporal punishment. To the contrary, not only did the intermediate appellate court *not* err by attempting to determine whether the corporal punishment was reasonable (albeit reaching an erroneous result, *see supra*, Part II), the real error would have been to follow the position advocated by petitioner. When a court is deciding whether a particular parental discipline is child abuse, whether it be under CL § 3–601 or FL §§ 5–701 or 4–501, the court always determines whether the corporal punishment was reasonable. As we have noted, child abuse excludes by definition reasonable corporal punishment. In the case *sub judice*, the agency action was lawful.

Petitioner also argues that "it makes sense" to have two different definitions of child abuse. Petitioner reasons that because issuing a child protective order is different from entering a parent's name into a central registry, the Legislature created two definitions of child abuse to correspond to these two distinct remedies available to the local department. Because the institution of a child protective order (which must be issued by a court, *see* FL § 4–506) is more drastic than entering the parent's name into a central registry, "it makes

sense" that FL § 4-501(b)(2) would carve out an exception for reasonable corporal punishment, thereby requiring the local department to provide more justification to a court in order to issue a more drastic order. FL § 5-701(b)(1), on the other hand, is easier for the local Department to fulfill because reasonable corporal punishment is no excuse under that definition. Thus, the local department will have an easier time satisfying § 5-701(b)(1) and can more easily institute the less drastic measure of entering a parent's name in a central registry.

Although the idea is superficially logical—that a lesser degree of injury on a child is required for a finding of "indicated" child abuse and a higher degree is required for the issuing of a protective order—it defies the plain language of the statute and is foreclosed. In any event, even were we to agree that this understanding is a viable interpretation, which it is not, and inquire into the legislative history, that inquiry would only confirm that petitioner is incorrect. Petitioner contends that the legislative history indicates an intent to create two different definitions in the Family Law Article. Petitioner's understanding of the legislative history, however, is misguided.

Originally, since at least 1991, FL § 4-501(b) defined child abuse as follows:

"(b) *Abuse.*—(1) 'Abuse' means any of the following acts committed by a household member against another household member:

* * *

(iii) abuse of a child, as defined in Title 5, Subtitle 7 of this article; or

* * *

"(2) Nothing in this subtitle shall be construed to prohibit reasonable corporal punishment, in light of the age and condition of the child, from being performed by a parent or stepparent of the child."

Md.Code (1984, 1991 Repl.Vol.) § 4–501(b) of the Family Law Article (superseded). The key moment, according to petitioner, occurred in 1994, when the Legislature passed amendments to FL § 4–501. *See* 1994 Laws of Maryland ch. 469, § 1, at 2250. The amended statute reordered these provisions as reflected in FL § 4–501(b)(2), which has remained unchanged since the 1994 amendments:

> "If the person for whom relief is sought is a child, 'abuse' may also include abuse of a child, as defined in Title 5, Subtitle 7 of this article. Nothing in this subtitle shall be construed to prohibit reasonable punishment, including reasonable corporal punishment, in light of the age and condition of the child, from being performed by a parent or stepparent of the child."

Petitioner compares the 1984 version of FL § 4–501's definition of child abuse with the 1994 amended version and interprets those changes as instituting an entirely new definition of child abuse. "At the same time [it made these changes to the statute in 1994], the Legislature made clear that 'abuse' as it was now defined by FL § 5–701 would not necessarily constitute abuse for purposes of FL 4–501(b)(1) [sic]. The amended statute provided, as it does now, that abuse, as defined in 4–501(b)(1) [sic] '*may* also include abuse of a child,' as defined in FL § 5–701." Petitioner's brief at 15–16 (emphasis in original) (citation omitted). In other words, Petitioner fashions the legislative intent to create a version of child abuse in FL § 4–501 different from FL § 5–701 primarily through the use of the word "may" when, for the last 10 years prior to the amendment, the definitions were the same and notwithstanding the fact that the definition does not merely repeat but *incorporates* the definition found in FL § 5–701.

Petitioner's interpretation of the legislative history is incorrect. The creation of two separate, distinct definitions of child abuse within the same article—one of which is constituted by a reference to the other—would be an extraordinary thing for the Legislature to do mainly through the addition of an auxiliary verb. In sum, there is only one definition of child

abuse in the Family Law Article, absent any statutory or legislative indication that two were intended.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*