973 A.2d 256

**COMPTROLLER OF the TREASURY**

v.

**JOHNS HOPKINS UNIVERSITY.**

**No. 532, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

June 9, 2009.

172

Cristina A. Milnor (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellant.

T. Scott Basik, Baltimore, for appellee.

Panel: DEBORAH S. EYLER, WRIGHT, CHARLES E. MOYLAN, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

Johns Hopkins University ("Hopkins" or "the University"), the appellee, applied for a refund of admissions and amusement taxes it paid to Baltimore City, as collected by the Comptroller of the Treasury ("the Comptroller"), the appellant, on gross receipts from ticket sales to intercollegiate men's lacrosse games in 2002, 2003, and 2004. When the Comptroller denied the refund request, Hopkins filed a challenge in the Maryland Tax Court. Ultimately, the Tax Court granted the refund. After that decision was affirmed on judicial review by the Circuit Court for Baltimore City, the Comptroller noted this appeal, posing one question for review:

Did the Maryland Tax Court commit legal error when it decided that the gross receipts from intercollegiate athletic events were used exclusively for an educational purpose?

For the reasons that follow, we uphold the decision of the Tax Court and therefore shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

In an evidentiary hearing before the Tax Court, on September 13, 2006, Hopkins called witnesses Debra Sorandes, Senior Tax Accountant for the University, and Tom Calder, Director of Athletics and Recreation for Hopkins, and the Comptroller called witness Theresa Trentler, Refund Supervisor. The basic first-level facts were not in dispute.

On March 7, 2005, Hopkins filed a written refund application with the Comptroller, seeking to recover $40,672.40 in admissions and amusement taxes it had paid on ticket sales receipts from intercollegiate men's lacrosse games between February 2002 and June 2004. The authority to impose an admissions and amusement tax is granted by the State to counties and municipal corporations by Title 4 of the Tax–General Article ("T–G") (1988, 2004 Repl.Vol.), specifically, T–G sections 4–101(b)(1) and 4–102.[1] Any admissions and amusement tax imposed by a county or municipal corporation must be paid to the Comptroller, and filed with an admissions and amusement tax return. *Id.* §§ 4–201, 4–301.

---

1. T–G section 4–101(b)(*l*) states, in relevant part:
   "Admissions and amusement charge," unless expressly provided otherwise, means a charge for:
   (i) admission to a place, including any additional separate charge for admission within an enclosure;
   (ii) use of a game of entertainment;
   (iii) use of a recreational or sports facility;
   (iv) use or rental of recreational or sports equipment; and
   (v) merchandise, refreshments, or a service sold or served in connection with entertainment at a nightclub or room in a hotel, restaurant, hall, or other place where dancing privileges, music, or other entertainment is provided."
   T–G section 4–102(b) authorizes a municipal corporation to impose, "by ordinance or resolution, a tax on: . . . (1) the gross receipts derived from any admission and amusement charge in that municipal corporation. . . ." (Likewise, pursuant to T–G section 4–102(a), a county may impose such a tax.)

Hopkins sought its refund on the ground that Baltimore City's authority to impose the admissions and amusement tax in question was limited by T–G section 4–103(b)(4)(i):

(b) *Counties and municipal corporations.*—The admissions and amusement tax may not be imposed by a county or municipal corporation on gross receipts: ... (4) **derived from any charge for admission** or for merchandise, refreshments, or a service, **if the gross receipts are used exclusively for:** (i) a charitable, **educational,** or religious **purpose** ...

(Emphasis added.)

Hopkins has a National College Athletic Association ("NCAA") Division I lacrosse program. Men's and women's home lacrosse games are played at Homewood Field, which is located on Hopkins's campus, in Baltimore City. The field is surrounded by a rubberized jogging track. Seating is by bleachers.

Like crab cakes, the Orioles, Old Bay seasoning, and Berger Cookies, men's lacrosse is quintessential to Baltimore City's culture.[2] On average, about 1,000 students attend each home men's lacrosse game. NCAA rules allow Hopkins to charge non-students a price of admission to its Division I lacrosse games, and the Baltimore men's lacrosse fan base generates a market.[3] Every year, the gross receipts from Hopkins's men's lacrosse games total about $140,000. Of that sum,

---

**2.** As Ogden Nash observed in one stanza of his poem, "Baltimore":

In the Midwest basketball is a menace,

In California, the kids play tennis,

In China I'm told they're mad for joss sticks,

But here the boys are born to lacrosse sticks.

*Holiday Magazine,* Vol. 21, No. 3 (March, 1957). (A joss stick is a type of incense.)

**3.** Although the NCAA rules would allow Hopkins to charge admission to its women's intercollegiate lacrosse games, it does not do so. The other varsity sports at Hopkins are NCAA Division III. The NCAA does not allow admissions charges for Division III regular season games. At the time of the evidentiary hearing in 2006, the ticket charge for Hopkins's men's lacrosse games was $6.00 per seat for general admission and $8.00 for reserved seating.

around $100,000 is spent to cover the costs of the games (such as security, public address announcers, ticket takers, stadium cleaning, and field lining and preparation), and the remaining approximately $40,000 is deposited with the Hopkins Athletic Department.

At the end of a given year, that money is transferred to the account of "Homewood Student Affairs." It is spent to make repairs to Homewood Field, repair and replace the jogging track, and, every 8 to 10 years, replace the artificial turf. That turf was installed originally because it is a safer surface for the athletes than grass (or lesser grades of artificial turf). Turf replacement costs about $1.2 million dollars. Because the receipts in question only cover about 30% of that' amount, the remainder is paid by the University. The rubberized jogging track also was installed for safety purposes, not only because it is easier on runners' legs but also because the University discourages its students from jogging in surrounding neighborhoods, where traffic and security are problems.

Homewood Field is Hopkins's primary athletic venue. In addition to lacrosse, it is used for intercollegiate football, field hockey, and soccer. It also is used for intramural athletics, club athletics, fraternity games, graduation and other recognition ceremonies, ROTC training, and homecoming activities. The field is lighted, and the jogging track is used by faculty and students about 20 hours a day. (The track can be used when the field is in use, although the track is not available during intercollegiate sporting events.)

According to Mr. Calder, athletics of all sorts, including intercollegiate sports, are an important part of the educational function of the University. The mission statement of the Department of Athletics and Recreation states:

> The Department of Athletics and Recreation provides a broad program of sports and fitness activities for both men and women of all ability levels in order to enhance the quality of life of the Johns Hopkins community. Our programs develop the physical, social, educational, and emotional skills of the Johns Hopkins community at a level of

excellence which compliments the high academic standard of the University.

Mr. Calder explained that, although Hopkins students are not required to participate in athletics, sports is used at the University as a vehicle for teaching leadership, good citizenship, discipline, action under pressure, teamwork, and perseverance, all important aspects of education.

There also was evidence that the Comptroller had deemed Hopkins excluded from paying real property taxes on Homewood Field, and from paying sales tax; that under 26 U.S.C. section 501(c)(3), Hopkins is classified as a non-profit educational organization exempt from federal taxes, *id.* § 501(a); and that Hopkins's athletic program is subject to the prohibitions against gender discrimination set forth in Title IX of the Educational Amendments of 1972, 86 Stat. 373, 20 U.S.C. §§ 1681–1688.

In response to the University's refund request, field auditors employed by the Comptroller investigated and prepared a Field Audit Report. The auditors recommended granting the refund. Thereafter, by letter of April 23, 2005, Theresa Trentler denied the refund request. She did so, in her words, "because the gross receipts taken in from intercollegiate athletic activities were not exclusively for educational purposes." Hopkins petitioned the Comptroller to reverse that decision. On January 9, 2006, a hearing on the matter was held before a hearing officer for the Comptroller. A month later, the hearing officer issued a written decision finding Hopkins's "gross receipts from admissions to intercollegiate athletic events subject to the admissions and amusement tax . . . in that the gross receipts are not used exclusively for an educational purpose[,]" and upholding the denial of the refund claim.

Before the Tax Court, Ms. Trentler testified that, in her 18 years as Refund Supervisor for the Comptroller, it had been the Comptroller's policy that "intercollegiate athletics are not considered educational[,]" regardless of what the receipts are spent on. Later she clarified that testimony somewhat, saying

that it is the longstanding policy of the Comptroller that as long as the gross receipts from intercollegiate sporting events go to a college or university's athletic department, they are non-educational in purpose, no matter what they are spent on. She assumed, in so explaining, that the gross receipts from Hopkins's intercollegiate contests would be used to pay for the University's intercollegiate programs. She acknowledged that, under the Comptroller's longstanding policy, intramural college sports activities *do* serve an educational purpose. Thus, if the gross receipts in question had been paid for admissions to a Hopkins intramural lacrosse game, they would not have been taxable.

The Tax Court judge ruled from the bench that Hopkins was entitled to the admissions and amusement tax refund. He explained that it was not necessary to decide whether the gross receipts from the men's intercollegiate lacrosse games were used exclusively for educational purposes, because Homewood Field is used not only for intercollegiate but also for intramural games and for other educational purposes, such as ROTC exercises and graduation ceremonies. Relying upon interpretations of the word "exclusively" in other Maryland taxing statutes as meaning "primarily," the Tax Court ruled that it was sufficient that the gross receipts at issue were used primarily for educational purposes, and granted the refund on that basis. *See, e.g., Friends School v. Supervisor of Assessments of Baltimore City,* 314 Md. 194, 201 n. 3, 550 A.2d 657 (1988) ("The requirement of exclusive use may generally be satisfied by a showing that the property is used 'primarily' for exemption purposes, with only incidental or occasional use for other purposes."). A written order was filed on October 30, 2006.

The Comptroller filed an action for judicial review in the Circuit Court for Baltimore City. On May 23, 2007, the court entered an order reversing and remanding the case to the Tax Court with instructions to decide whether the "expenditures on intercollegiate athletics amount to an educational purpose." On remand, on July 25, 2007, the Tax Court judge issued a written order stating that "the gross receipts in question,

which were used in part for intercollegiate athletics at the school, were used exclusively in furtherance of the education of the students." On March 28, 2008, in a second action for judicial review brought by the Comptroller, the circuit court affirmed the Tax Court's decision. This appeal followed.

We shall include additional facts as necessary to our discussion.

## DISCUSSION

### (A)

The Comptroller of the Treasury is a "tax collector" responsible for collecting most Maryland taxes, including the admissions and amusement tax. T–G § 13–101(c)(2)(f) (defining "tax collector" to include the Comptroller). The Comptroller also is a "tax determining agency," that is, "a governmental unit of the State that is authorized to make the final decision or issue the final order about a tax issue within the jurisdiction of the Tax Court, before the decision may be appealed to the Tax Court." T–G § 13–501(c)(1). If an application for a refund of admissions and amusement taxes paid is timely filed with the Comptroller, the Comptroller or a designated employee promptly must hold an informal hearing, act on the application (which may include assessing additional tax, penalty, and interest), and mail notice of the final determination to the applicant. T–G § 13–508(c). An assessment of a tax under the Tax–General Article "is prima facie correct." T–G § 13–411.

The final decision of the Comptroller on, among other things, an application for refund of admissions and amusement taxes paid, may be appealed by an aggrieved party to the Tax Court. T–G § 13–510(a). The Tax Court is an independent statewide administrative agency, established by T–G section 3–102. Pursuant to T–G section 3–103(a),

[t]he Tax Court has jurisdiction to hear appeals from the final decision, final determination, or final order of a property tax assessment appeal board or any other unit of the

State government or of a political subdivision of the State that is authorized to make the final decision or determination or issue the final order about any tax issue, including: (1) the valuation, assessment, or classification of property; (2) the imposition of a tax; (3) the determination of a claim for refund; (4) the application for an abatement, reduction, or revision of any assessment or tax; or (5) the application for an exemption from any assessment or tax.

■ Appeals to the Tax Court proceed *de novo.* T–G § 13–523. Although the Tax Court is not actually a court, as it is an agency within the Executive Branch of State government, it acts in a quasi-judicial capacity, making factual findings and adjudicating disputes. *Foss NIRSystems, Inc. v. Comptroller of the Treasury,* 151 Md.App. 44, 51–53, 822 A.2d 1297 (2003). "Proceedings in the Tax Court are governed by [T–G sections] 13–514 to 13–529, which provide a party with the procedural rights to a prompt hearing, to appear before the Tax Court *pro se* or represented by counsel, to introduce evidence, subpoena witnesses, and conduct depositions, and to submit certain fact issues for resolution by a jury." *Knoche v. State,* 171 Md.App. 209, 218, 908 A.2d 1247 (2006). The Tax Court's functions thus resemble court proceedings, even though they are not. *White v. Prince George's County,* 282 Md. 641, 658, 387 A.2d 260 (1978); *Shell Oil Co. v. Supervisor of Assessments of Prince George's County,* 276 Md. 36, 47, 343 A.2d 521 (1975).

The Tax Court "may reassess or reclassify, abate, modify, change or alter any valuation, assessment, classification, tax or final order" appealed to it. T–G § 13–528(a)(2). However, "[a]bsent affirmative evidence in support of the relief being sought or an error apparent on the face of the proceeding from which the appeal is taken, the decision, determination, or order from which the appeal [to the Tax Court] is taken shall be affirmed." T–G § 13–528(b). The Tax Court must issue a "written order that sets forth its decision." T–G § 13–529(a). T–G section 13–532(a) makes a final decision of the Tax Court subject to judicial review in the circuit court pursuant to sections 10–222 and 10–223 of the State Government Article

("SG"); and that court's judgment is subject to appellate review in this Court. SG § 10–223(b).

Because the Tax Court is an administrative agency, its decisions are reviewed under the same appellate standards generally applied to agency decisions. *SDAT v. Consolidation Coal Sales Co.*, 382 Md. 439, 453, 855 A.2d 1197 (2004). We review the decision of the Tax Court, not the ruling of the circuit court on judicial review. *Comptroller v. Clise Coal, Inc.*, 173 Md.App. 689, 696–97, 920 A.2d 561 (2007). The Tax Court's factual findings are reviewed for substantial evidence in the record. *Id.* at 697, 920 A.2d 561; SG § 10–222(h)(3)(v). Under the substantial evidence test, a factual finding must be upheld if it is such that a reasoning mind reasonably could have found it from the agency record (here, the evidence before the Tax Court). *Dep't of Natural Res. v. Heller*, 391 Md. 148, 166, 892 A.2d 497 (2006); *Md. Aviation Admin. v. Noland*, 386 Md. 556, 571, 873 A.2d 1145 (2005). Even if the Tax Court does not state the reasons for its decision, reversal is not required "if the record discloses substantial evidence supporting the decision." *Bethlehem Steel Corp. v. Supervisor of Assessments of Baltimore County*, 38 Md.App. 543, 546, 381 A.2d 1185 (1978) (Wilner, J.).

Likewise, we review the Tax Court's mixed findings of fact and law for substantial evidence in the agency record. "[D]eterminations involving mixed questions of fact and law must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, 'a reasoning mind could have reached the Tax Court's conclusion.'" *NCR Corp. v. Comptroller*, 313 Md. 118, 133–34, 544 A.2d 764 (1988) (in turn quoting *Comptroller v. NCR*, 71 Md.App. 116, 133, 524 A.2d 93 (1987)). We are not so constrained in our review of the Tax Court's decisions of law. *Ramsay, Scarlett & Co. v. Comptroller*, 302 Md. 825, 834, 490 A.2d 1296 (1985). Ordinarily, that review is *de novo*. *SDAT v. Consumer Programs, Inc.*, 331 Md. 68, 72, 626 A.2d 360 (1993). Yet, "'[e]ven with regard to some legal issues, a degree of deference should often be accorded the position of

the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.'" *Noland, supra,* 386 Md. at 572, 873 A.2d 1145 (quoting *Bd. of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376 (1999)).

### (B)

In their arguments before the Tax Court, the parties both referred to two decades-old Maryland Executive Branch decisions about admissions and amusement taxes on gross receipts collected from intercollegiate sporting events. The parties devote much of their argument in this Court to those decisions, as well.

In 1950, Attorney General Hall Hammond (later Associate Judge and then Chief Judge of the Court of Appeals) responded to a question posed by the Comptroller as to whether Western Maryland College (now McDaniel College) should be "exempted" "from the necessity of collecting an admissions tax on the sale of tickets to College football games on the ground that the proceeds derived thereby are used exclusively for educational purposes," within the meaning of a predecessor statute to T–G section 4–103(b)(4)(i).[4] The Attorney General answered that the College was not "exempted" from paying the admissions and amusement tax for gross receipts from intercollegiate football games:

> When the word "education," as used in [the statute] is considered with due regard to the canon of construction that tax exemptions are to be construed strictly against the taxpayer, we do not think that it can be said that the Legislature intended to exempt gross receipts derived from

---

4. When the Attorney General wrote his opinion, the admissions and amusement tax was codified in Article 81 of the Maryland Code (1939), as amended by 1949 Laws of Maryland, chapter 255. Section 341(a) of that article "exempted" from the admissions and amusement tax "gross receipts derived from the amounts charged for admissions ... when such gross receipts are devoted exclusively to charitable, religious, or educational purposes...."

the sale of tickets to intercollegiate athletic contests from the admissions tax. While a program of physical education in modern educational thinking is as essential as training in purely academic and technical subjects, it seems to us that it would unduly strain the ordinary and usual meaning of the word "educational" to include intercollegiate athletic contests. Our opinion might be otherwise were the proceeds derived from the sale of tickets to athletic contests used by Western Maryland to purchase equipment and to defray the other necessary expenses of a program of intermural [sic] athletic contests or physical education to individual students. We do not believe, however, that when these gross receipts are used to defray expenses of intercollegiate athletic contests that they may be properly said to be tax exempt.

35 *Op. Md. Atty. Gen.* 304, 308 (1950).

In so concluding, the Attorney General relied upon the dissenting opinion in *Page v. Regents,* 93 F.2d 887 (5th Cir. 1937), *rev'd on other grounds, sub. nom. Allen v. Regents,* 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448 (1938). The Fifth Circuit majority in *Page* held that receipts from intercollegiate football games were not subject to the federal admissions tax because the games were educational activities:

Great judgment is necessary to prevent the stimulus of publicity from becoming too great, lest the athletic tail be found wagging the dog of mental culture in the schools, but in principal the public exhibition of the best in athletics is not different from the school exhibitions of our boyhood or from the honors and speakerships at commencements of most colleges.

93 F.2d at 892. The dissenter in *Page,* apparently a firm believer in the "ivory tower" model of higher education, complained:

My associates, apparently to their own satisfaction, have rationalized themselves into the frame of mind to believe and to say that these modern gladiatorial spectacles, conducted in vast and costly amphitheatres, for the excitement and amusement of the American public, all present being

keyed to a pitch and under a tension wholly foreign to that ordinarily associated with academic and educational pursuits, are an essential part of higher education in Georgia, and, as such, a governmental function of that State. They have not rationalized me into that frame of mind; I cannot rationalize myself into it. It seems to me that the mental processes by which the din and delight, the struggle and stress, the flying arms and legs, the alternate tangles and extrications, and all the heady actions of an intercollegiate football game, are envisioned as higher education, are a "reductio ad absurdum" of even modern higher educational theory. They seem to me in the slangy but expressive vernacular common in the stadiums, to "take higher education for a ride."

*Id.* at 895. The Attorney General opined that his office "subscribe[d] to the views of [the dissenting judge in *Page* ] without, however, indicating that we believe that his colorful language describes the part which intercollegiate athletic contests play in the program of education of Western Maryland College." 35 *Op. Md. Atty. Gen.* at 308.

Twenty-five years after the 1950 Attorney General opinion, and 40 years after the precedents upon which it relied, the Maryland Tax Court ruled, in *Naval Academy Athletic Association v. Comptroller of the Treasury,* 1977 WL 1568 (Md.Tax 1977), that gross receipts derived from admissions to Navy men's intercollegiate football and lacrosse games are devoted exclusively to educational purposes, and therefore are "exempt" from the State admissions and amusement tax.[5] The facts adduced before the Tax Court showed that the gross receipts in question not only were used to pay the costs of the games but also were spent to "loan money to various athletic coaches, pay the salaries of certain of the coaches of intercollegiate athletic teams, ... maintain a fund for entertaining

---

5. By 1977, the admissions and amusement tax had been recodified to Md.Code (1957, 1975 Repl.Vol., 1977 Cum.Supp.), Article 81, sections 402 through 411. Section 406, entitled "Exemptions from tax," was unchanged, in relevant part, from the language in section 341(a) of article 81 of the 1939 Code, as amended by the 1949 Acts.

coaches, their spouses and visiting school officials [and on] travel, promotion, recruitment, entertainment, advertisement, hotel and meals, equipment and administration." *Id.* at *1.

The Tax Court disagreed with the 1950 Attorney General opinion insofar as it used "the extent of financial support given to the [school] from the gross receipts derived [ ] from the contest" as the sole gauge of whether those receipts were devoted exclusively to an educational purpose. *Id.* at *2. "[I]t is equally important to consider the benefits derived by the participants and/or the spectators" in deciding whether such gross receipts are devoted exclusively to an educational purpose. *Id.* The Tax Court emphasized that students at the Naval Academy are required to participate in either intramural or intercollegiate athletics; and that, unlike most colleges and universities, the Naval Academy "is charged with the responsibility of educating men and women to create career oriented professional line officers," so the "school must concern itself with both the physical and mental development of its midshipmen." *Id.*

The Comptroller petitioned for judicial review in the Circuit Court for Anne Arundel County. That court affirmed the Tax Court's ruling. The Comptroller did not note an appeal to this Court.

## (C)

In the case at bar, the Comptroller contends the Tax Court committed legal error by misinterpreting the meanings of "exclusively" and "educational purpose" in T–G section 4–103(b)(4)(i), and that we should engage in a *de novo* review of that decision. It maintains that it, not the Tax Court, is the unit of government that administers the Maryland tax code, insofar as the admissions and amusement tax is concerned, and that its longstanding interpretation of "educational purpose" as not encompassing intercollegiate athletic contests should be accorded deference by this Court. It also argues that, to the extent the Tax Court in the *Naval Academy* case recognized a limited situation in which intercollegiate sports

serve an exclusively educational purpose—that is, when courses in athletics are required by the school—that circumstance does not apply here.

Hopkins counters that the Tax Court's finding in this case that the gross receipts from ticket sales to the men's lacrosse games are used exclusively for an educational purpose was factual, and therefore is subject to review for substantial evidence in the record. It asserts that, from the facts in evidence before the Tax Court, in particular the testimony of Mr. Calder, and even taking into account the legal presumption that the Comptroller's decision to deny the claimed refund was correct, a reasoning mind reasonably could find that intercollegiate lacrosse serves an "educational purpose" at Hopkins and that the gross receipts in question were used exclusively for that purpose.[6] Further, Hopkins implicitly takes the position that the Tax Court is the agency charged with interpreting the admissions and amusement tax statute, and that, to the extent this Court is to give weight to any administrative body's interpretation of that statute, weight should be accorded to the decision of the Tax Court, not to the longstanding policy of the Comptroller.

In *Charles County Department of Social Services v. Vann,* 382 Md. 286, 855 A.2d 313 (2004), in the course of holding that "when, in the course of administering corporal punishment, the child disobeys the parent and consequently is injured is patently a mixed question of law and fact[,]" *id.* at 297, 855 A.2d 313, the Court of Appeals clearly explained what a "mixed question of law and fact" is:

[Some] agency decisions fall within categories that are neither legal conclusions nor factual findings, *see. e.g., Spencer [v. Board of Pharmacy]*, 380 Md. 515, 846 A.2d 341 [ (2004),] (explaining judicial review over discretionary functions of the agency), *and some fall within both. These*

---

**6.** Hopkins does not challenge the circuit court's ruling, in the initial action for judicial review, rejecting the Tax Court's original determination that "exclusively," as used in T–G section 4–103(b)(4)(f), means primarily.

*latter sort commonly are known as "mixed questions of law and fact" or application of law to facts:* The agency has correctly stated the law and its fact-finding is supported by the record, but the question is whether it has applied the law to the facts correctly. When the agency decision being judicially reviewed is a mixed question of law and fact, the reviewing court applies the substantial evidence test, that is, the same standard of review it would apply to an agency factual finding.

382 Md. at 296, 855 A.2d 313 (emphasis added). In so explaining, the *Vann* Court relied upon *Ramsay, Scarlett v. Comptroller, supra,* 302 Md. 825, 490 A.2d 1296, a Tax Court review decision:

In *Ramsay* . . ., we addressed the standard of review of an administrative agency decision. The Court of Special Appeals had held that the taxing authority's determination on whether a particular corporation was unitary or binary was a conclusion of law, subject to *de novo* judicial review. We disagreed and held that the question was rather the application of the law to the "established evidence" in the record. Finding no disagreement between the court and the agency regarding the applicable law, we noted the distinction was really about the

"proper application [of the governing law] to the established evidence of record. . . . Whether a business is unitary or separate and distinct for tax purposes . . . is not solely a question of law; rather, the issue for purposes of appellate review . . . is governed by whether, in light of substantial evidence appearing in the record, a reasoning mind could reasonably have reached the conclusion reached by the Tax Court."

382 Md. at 297–98, 855 A.2d 313 (quoting *Ramsay, supra,* 302 Md. at 837–38, 490 A.2d 1296). The *Vann* Court noted that deferential "substantial evidence" review of an agency's decision on a mixed question of law and fact "is appropriate in order for the agency to fulfill its mandate and exercise its expertise." *Id.* at 298, 855 A.2d 313. *See also Thames Point Assocs. v. Supervisor of Assessments,* 68 Md.App. 1, 509 A.2d

1207 (1986) (holding that whether a condominium is substantially completed is a mixed question of law and fact subject to substantial evidence review).

In the case at bar, the question before the Tax Court—whether the gross receipts from ticket sales to Hopkins intercollegiate men's lacrosse games are used exclusively for an educational purpose—likewise was a mixed question of law and fact. As we have observed, the first-level facts in this case were not in dispute. And, after the matter was remanded by the circuit court in the first action for judicial review, the Tax Court's decision was not a pure exercise in statutory interpretation of the word "exclusively," which ordinarily would be subject to *de novo* review. *See, e.g., Comptroller v. Sci. Applications Int'l Corp.,* 405 Md. 185, 197–204, 950 A.2d 766 (2008) (applying *de novo* review to statutory interpretation in tax case); *United States v. Ambrose,* 403 Md. 425, 942 A.2d 755 (2008) (statutory interpretation a question of law). Rather, the Tax Court was deciding the question before it by applying the law to the facts.

We disagree with the Comptroller that, on our review of the Tax Court's decision on this mixed question of law and fact, we should take into account and defer to the expertise of the Comptroller, which for decades has acted as the tax collector for Baltimore City (and other counties) for admissions and amusement taxes on the gross receipts from intercollegiate athletic contests. To be sure, and as noted, the Comptroller is a "tax determining agency," that is, a "governmental unit of the State that is authorized to make the final decision or issue the final order about a tax issue within the jurisdiction of the Tax Court, before the decision may be appealed to the Tax Court[,]" T–G § 13–501(c); and the Tax Court, in deciding the case at bar, was bound to presume that the Comptroller's decision was correct. Nevertheless, on substantial evidence review of the Tax Court's decision on a mixed question of law and fact, we give deference to the Tax Court's application of T–G section 4–103(b)(4)(i), not the

Comptroller's, as the Tax Court is the agency charged with interpreting and applying the Maryland tax code.

As already mentioned, in the *Naval Academy* case, in deciding whether Navy's intercollegiate athletic contests furthered an educational purpose of the school, the Tax Court rejected the notion of a single-factor application of T–G section 4–103(b)(4)(i). Instead, the Tax Court considered not only the financial benefit to the school but also the non-financial benefits to the school and the benefits to the athletes and the spectators from the intercollegiate athletic contests. The court took into account that intercollegiate athletes at the Naval Academy could satisfy their physical education course requirements by playing on the intercollegiate teams; that the high level of student participation (50%) created an "esprit de corps" beneficial to all of the midshipmen; that athletic competition "develops and fosters such desirable military qualities as perseverance, the ability to plan strategy, the ability to keep cool and think clearly under pressure, confidence, aggressiveness, determination, discipline, the will to win, and submission to the rules of the game"; and that the IRS had granted the Naval Academy an exemption from income tax based on its educational status. 1977 WL 1568 at \*2. The Tax Court also noted the weakness in the 1950 Attorney General opinion to the extent that it would recognize intramural athletics, but not intercollegiate athletics, as educational in purpose:

> Similar to providing more challenging academic courses to those with greater [aptitude], intercollegiate athletics offer gifted athletes a level of competition otherwise unavailable. Intercollegiate athletics is a natural and logical extension of the intramural program.

*Id.*

The Tax Court thus engaged in a totality of the circumstances assessment of who and/or what was benefited from the gross receipts, and how the benefits were derived. Read in the context of what little Maryland law existed at the time, namely the 1950 Attorney General opinion, the Tax

Court's decision in the *Naval Academy* case was not limiting in nature; it was expansive. We disagree with the Comptroller's argument that the Tax Court ruled in the *Naval Academy* case that a university or college *must* require physical education as part of its curriculum for its intercollegiate athletic contests to be deemed "exclusively for an educational purpose." The Tax Court took note of the Naval Academy's physical education requirement as one factor to be considered in deciding whether the gross receipts from Navy intercollegiate lacrosse games derived from activities exclusively for an educational purpose. Thus, the Tax Court's decision in the case at bar did not disregard or contradict its 1977 application of Article 81, section 406, containing the identical "educational purpose" language as now appears in T–G section 4–103(b)(4)(i).[7]

There is substantial evidence in the record before the Tax Court in this case to support its conclusion that the gross receipts from the Hopkins men's intercollegiate lacrosse games were used exclusively for an educational purpose. The evidence showed that the gross receipts were used to benefit the University, the intercollegiate athletes, other non-participating students, and spectators of the sport. All of the net

---

7. By Chapter 2 of the Laws of Maryland 1988, the admissions and amusement tax provisions in former article 81 were recodified into the new Tax–General Article. What had been the prior section 406 "exemption" from the admissions and amusement tax for gross receipts devoted exclusively to a charitable, religious, or educational purpose was made a "limitation" on the authority to tax, under T–G section 4–103 (entitled "Limitations on authorization to tax"). The "Exemptions" section, which no longer included gross receipts used exclusively for a charitable, religious, or education purpose, was recodified at T–G section 4–104. As the recodification was not intended to be a substantive revision of the then-current law, it apparently created a separate section for the limitations on taxing authority that previously had been lumped into the category of "Exemptions." *See Allen v. State*, 402 Md. 59, 71–72, 935 A.2d 421 (2007) (noting that recodification ordinarily is presumed not to effect substantive change in the law " 'unless the change is so radical and material that the intention of the legislature to modify the law appears unmistakably from the language of the Code.' ") (quoting *Comptroller of the Treasury v. Blanton*, 390 Md. 528, 538, 890 A.2d 279 (2006)).

proceeds, that is, about $40,000 per year for the three years in question, were spent directly on the cost of maintaining and repairing Homewood Field. The field is used by all students and their families for commencement exercises, which are plainly educational in nature, and is used by some of the students for ROTC and for intramural games. As noted above, intramural athletic contests always have been treated by the Maryland taxing authorities and the Tax Court as educational in purpose. The jogging track is used by students and faculty nearly 24 hours a day. No profits from the ticket sales were applied to more tangentially educational activities such as the entertainment, travel, and promotional costs the Tax Court considered educational in purpose in the *Naval Academy* case. Nor were any profits spent to pay for uniforms and equipment for the intercollegiate lacrosse athletes. Indeed, in the case at bar, the Comptroller effectively agreed that, to the extent the net profits from the intercollegiate lacrosse ticket sales were spent to maintain and repair Homewood Field and the jogging track around it, that part of the gross receipts was used for educational purposes.

The $100,000 remainder of the gross receipts was pre-profit, *i.e.*, it was the money used to pay for the costs of the games themselves. The use of those receipts raises more directly the question whether, on the evidence here, the intercollegiate men's lacrosse contests further the educational purposes of Hopkins as an institution.

The evidence before the Tax Court showed that about 50% of the students at Hopkins are involved in athletics of some sort; as Mr. Calder put it, "anything from varsity athletics through recreation, club sports, intramurals, using the recreation center and taking ... recreational classes there." The University has 26 varsity sports teams, all Division III except for the two lacrosse teams, and about 20% of the students participate in these intercollegiate games. There are about 600 total intercollegiate athletes at Hopkins. Mr. Calder testified that athletics in general is an important component of the University's educational program, commenting that,

[p]art of the things that we try to teach our athletes are leadership, thinking under pressure, dealing with all kinds of adversarial things that can happen during games. And I think that's a major part of what we're trying to reach and teach our other students also.

When asked whether intercollegiate sports, including lacrosse, serve an educational purpose at Hopkins, Mr. Calder replied:

Yes, they do. As a matter of fact, I was evaluating my lacrosse coach this morning.... He talked about a big part of his philosophy is leadership, which is a major push by the University's dealing with leadership too. They [the student athletes] learn all kinds of things during the games, especially being able to compete and handle situations where you have to think very quickly. It's something, again, that the University really, really wants all of our students, not only the athletes, to be able to do.

Mr. Calder further testified that it is the stated goal of the President of the University to have athletic programs that are as highly ranked as the school's academic programs; that intercollegiate home men's lacrosse games in particular are very well attended by students, faculty, staff, and alumni so as to "create a lot of school spirit on campus"; that the Pep Band, which is part of the University's Music Department, plays at the games; and that students who participate in athletics, and intercollegiate sports in particular, develop qualities that make them desirable to hire and student athletes draw employers to campus for hiring. Mr. Calder stated that the student athletes have higher graduation rates and grade point averages than the overall student population and that "quite a few" are serving in the military post-graduation. He opined that the character traits the Tax Court had found to be important for the educational mission of the Naval Academy— such as determination, confidence, discipline, perseverance— are important for success not only in athletics but also after graduation, in the world of competition, military or non-military.

The Tax Court judge reasonably could conclude from this evidence that all of the profits from the gross receipts in question are spent to support programs and events that even the Comptroller conceded are educational in purpose (in particular, to maintain and repair the field that is used for intramural sports and other educational activities); at Hopkins, the athletes who participate in intercollegiate sports, especially lacrosse, learn skills and behaviors that enable them to achieve academically, while in school, and in the world of competition, after school; the same educational purposes served by intramural sports are served by intercollegiate sports, in particular lacrosse, except that the level of play is higher and more competitive; men's intercollegiate lacrosse games are integral to Hopkins's school identity; and the federal government has recognized that intercollegiate athletics at Hopkins serve an educational purpose. The record thus contains substantial evidence to support the Tax Court's mixed finding of law and fact that the gross receipts generated from ticket sales to Hopkins's men's intercollegiate lacrosse games are used exclusively for an educational purpose.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**